**HENDERSON, Administrator, Office of Price Administration, v. KIMMEL.**

No. 2049.

District Court, D. Kansas, Second Division.

Oct. 23, 1942.

Talbot Smith, Chief, Civil Litigation Branch, Office of Price Administration, of Washington, D. C. (David Ginsburg, Gen. Counsel, and Brunson MacChesney, Asst. Gen. Counsel, both of Washington, D. C., Jerome Walsh, State Attorney for Missouri, of Kansas City, Mo., Taylor Sandison, State Enforcement Attorney, of St. Louis, Mo., Harry W. Jones, Chief, Appellate Briefing Branch, and Wm. R. Brown, Abraham Glasser and Harry Shniderman, Attys., Office of Price Administration, all of Washington, D. C.), for plaintiff.

Austin M. Cowan, of Wichita, Kan. (Grey Dresie and Willard M. Glasco, both of Wichita, Kan.), for defendant.

Before PHILLIPS, Circuit Judge, and HOPKINS and SAVAGE, District Judges.

PHILLIPS, Circuit Judge.

Leon Henderson, as Administrator of the Office of Price Administration,[1] brought

[1] Hereinafter called the Administrator.

this action against Temperance Kimmel seeking both a preliminary and a permanent injunction enjoining Kimmel from directly or indirectly demanding or receiving rents in excess of those established by Maximum Rent Regulation No. 10 [2] (7 Fed.Reg. 4069); directly or indirectly threatening to exclude or attempting to exclude R. D. Boyd and Mrs. R. D. Boyd, or any other tenants, from possession of any housing accommodations in violation of Regulation No. 10; directly or indirectly bringing, maintaining, prosecuting, or continuing any action to evict the Boyds, or any other tenants, from any housing accommodations in violation of Regulation No. 10; and from committing or continuing any acts, practices, or omissions in violation of any regulation, requirement, or order relating to rent issued by the Administrator pursuant to the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix § 901 et seq. [3]

Kimmel filed an answer and counterclaim in which she attacked the constitutionality of the Act and Regulation No. 10 and sought a preliminary and permanent injunction enjoining the plaintiff from enforcing against her the provisions of the Act, and from interfering with the use and occupancy of her premises, and with her right to invoke the jurisdiction of the state courts and pursue the remedies given her by the statutes of the State of Kansas, and suspending the penal provisions of the Act until she could test the constitutionality of the Act, and, in the alternative, that the court decree that the Administrator appoint appraisers to appraise the property of Kimmel and others similarly situated, and fix a fair, reasonable, and compensatory rental.

Thereupon, a three-judge court, duly constituted under 28 U.S.C.A. § 380a, convened and heard the applications for preliminary injunctions.

Affidavits were offered in behalf of the Administrator and Kimmel.

On March 2, 1942, the Administrator, having found that defense activities had resulted in increases in the rents for housing accommodations in Sedgwick County, Kansas, inconsistent with the purposes of the Act, pursuant to § 2(b) thereof, desig-nated Sedgwick County as a defense-rental area. He recommended that within 60 days rents in the county should be stabilized and reduced by state or local regulation (7 Fed. Reg. 1684). On May 27, 1942, after the expiration of the 60-day period, the Administrator found that his recommendation of March 2, 1942, had not been complied with and thereupon he issued Regulation No. 10. It became effective on June 1, 1942, in Sedgwick County, Kansas, [4] and froze rents in the Wichita area at July 1, 1941, figures.

Kimmel owns an apartment building containing eight apartments, located at 236 South Hydraulic Avenue, Wichita, Kansas. On July 1, 1941, she rented four of such apartments at rentals of $35 per month each, and three at rentals of $37.50 per month each. She lives in one of the apartments and gives most of her time to taking care of the apartments. Raymond D. Boyd, an inspector of spot welding at one of the Boeing plants, occupies one of the $35 apartments. On June 8, 1942, he tendered Kimmel the sum of $17.50 in payment of rental for the 15-day period beginning June 8, 1942, the rent being payable on the 8th and 23rd days of each month. The rent for the preceding month had been $45 per month. Kimmel refused to accept the rental and demanded the sum of $22.50. On June 11, 1942, Kimmel agreed to accept the sum of $17.50, but thereupon served notice on Boyd to quit the premises on June 26, 1942. On June 23 and 24, Boyd made offers to pay the rental of $17.50 for the period beginning June 23 and ending July 7, but both offers were rejected. Kimmel offered to accept four days rent on the basis of $35 per month for the period between June 22 and June 26. On June 27, 1942, Kimmel served Boyd with a three-day notice to quit the premises. On July 1, 1942, Kimmel filed a complaint in the City Court of Wichita for recovery of the apartment occupied by Boyd. On July 6, 1942, the matter came on for hearing. On July 9, 1942, the City Court gave judgment for Kimmel, and on the following day, Boyd received a copy of a writ of restitution which ordered him to vacate the premises immediately. Boyd moved for a new trial on July 13, 1942, and on July 14, 1942, the City Court vacated the judgment on the

---

[2] Hereinafter called Regulation No. 10.

[3] Hereinafter called the Act.

[4] Wichita is the chief city in Sedgwick County. Four large aircraft companies— Boeing, Beech, Culver, and Cessna—are located in Wichita. The rental area is known as the Wichita Defense-Rental Area.

ground that the notice to terminate the tenancy was insufficient.

The Administrator instituted the instant suit on July 15, 1942. On July 16, 1942, Judge Hopkins granted the Administrator's application for a temporary restraining order, which was extended by further order until the hearing on the applications for preliminary injunctions. The matter came on for hearing before the three-judge court on August 27 and 28, 1942. At the conclusion of the hearing, the court awarded a preliminary injunction against Kimmel as prayed for by the Administrator and gave the parties leave to file written briefs.

The affidavits established that the fair and reasonable value of the apartment building and the furniture therein is $22,500; that the maximum annual rent fixed under Regulation No. 10 for the apartments is $2,950; that the operating expenses, including taxes, upkeep, and obsolescence is $2,786.44, leaving a net annual income of $163.56, exclusive of the use of one apartment occupied by Kimmel; that since July 1, 1941, there has been an increase in upkeep costs as follows: labor 50%, wall paper 25%, paint 12%, and oils 33⅓%; that real estate taxes from July 1, 1941, to July 1, 1942, increased 16 per cent in the Wichita area; that it has been the custom and practice in Wichita for a number of years to charge a lower rental for apartments and houses during the months of June, July, and August than during the remaining nine months in the year; that Kimmel, without avail, sought relief from the alleged confiscatory schedule from the Rent Administration Office of Wichita.

Kimmel has not sought relief pursuant to the provisions of §§ 203 and 204 of the Act or Procedural Regulation 3 (7 Fed.Reg. 3936).

Section 1(a) of the Act declares it to be in the interest of the national defense and security and necessary to the effective prosecution of the war, inter alia, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency, to assist in securing production of commodities and facilities, and to prevent a post emergency collapse of values, and that such, among other purposes stated, are the objectives of the Act.

Section 1(b) of the Act limits the time the Act shall remain in force.

Section 2(a) of the Act authorizes the Administrator to establish maximum prices for commodities which in his judgment will be fair and equitable and will effectuate the purposes of the Act.

Section 2(b) of the Act provides that whenever, in the judgment of the Administrator, such action is necessary or proper in order to effectuate the purposes of the Act, he shall issue a declaration setting forth the necessity for, and recommendations with reference to, the stabilization or reduction of rents for any defense-area housing accommodations within a particular defense-rental area; that if within 60 days after the issuance of any such recommendations, rents for any such accommodations within such defense-rental area have not, in the judgment of the Administrator, been stabilized or reduced by state or local regulation, or otherwise, in accordance with the recommendations, the Administrator may, by regulation or order, establish such maximum rent or rents for such accommodations as, in his judgment, will be generally fair and equitable and will effectuate the purposes of the Act.

Section 2(b) further provides that the Administrator shall ascertain and give due consideration to the rents prevailing for such accommodations or comparable accommodations, on or about April 1, 1941, or if, prior or subsequent to that date, defense activities shall have resulted or threatened to result in increases in rents for such accommodations in such area inconsistent with the purposes of the Act, then on or about a date, not earlier than April 1, 1940, which in the judgment of the Administrator does not reflect such increases.

Section 2(b) further provides that the Administrator shall make adjustments for such relevant factors as he may determine and deem to be of general applicability in respect to such accommodations, including increases or decreases in property taxes and other costs.

Section 2(c) of the Act provides that any regulation or order may be established in such form and manner, may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions as, in the judgment of the Administrator, are necessary or proper to effectuate the purposes of the Act.

Section 2(d) of the Act provides that whenever, in the judgment of the Administrator, such action is necessary or proper to effectuate the purposes of the Act, he may, by regulation or order, regulate or prohibit renting or leasing practices, including practices relating to recovery of possession in connection with any defense-area housing accommodations, which, in his judgment, are equivalent to, or are likely to result in, rent increases.

Section 4 of the Act provides that it shall be unlawful, regardless of any contract, agreement, lease, or other obligation for any person to demand or receive any rent for any defense-area housing accommodations, or otherwise to do or omit to do any act, in violation of any regulation or order, or to remove or attempt to remove from any defense-area housing accommodations the tenant or occupant thereof, or to refuse to renew the lease or agreement for the use of such accommodations because such tenant or occupant has taken action authorized or required by the Act or any regulation or order.

Section 203 of the Act provides that within 60 days after the issuance of any regulation or order, any person subject to any provision thereof may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections to any such provision and affidavits or other written evidence in support thereof; that at any time after the expiration of such 60 days any person, subject to such regulation or order, may file such protest, based solely on grounds arising after the expiration of such 60 days; that statements in support of such regulation or order may be received and incorporated in the transcript of the proceeding, in accordance with regulations prescribed by the Administrator; that within a reasonable time after the filing of any such protest, but in no event more than 30 days after such filing, or 90 days after the issuance of the regulation or order, whichever occurs later, the Administrator shall either grant or deny such protest in whole or in part, notice such protest for hearing, or provide an opportunity to present further evidence in connection therewith; that in the event the Administrator denies any such protest in whole or in part, he shall inform the protestant of the grounds upon which such decision is based, and of any economic data and other facts of which the Administrator has taken official notice; that the Admin-

istrator may take official notice of economic data and other facts, and that any proceeding under such section may be limited by the Administrator to the filing of affidavits, or other written evidence, and the filing of briefs.

Section 204(c) of the Act creates the Emergency Court of Appeals and provides that it shall consist of three or more judges designated by the Chief Justice from the United States District Courts and Circuit Courts of Appeals.

Section 204(a) of the Act provides that any person aggrieved by the denial or partial denial of his protest may, within 30 days after such denial, file a complaint with the Emergency Court of Appeals, specifying his objections and praying that the regulation or order protested be enjoined or set aside in whole or in part; that such complaint shall forthwith be served on the Administrator, who shall certify and file with such court a transcript of such portions of the proceedings as are material under the complaint; that such transcript shall include a statement setting forth, so far as practicable, the economic data and other facts of which the Administrator has taken official notice; that upon the filing of such complaint, the court shall have exclusive jurisdiction to set aside such regulation or order in whole or in part, to dismiss the complaint, or to remand the proceeding; that no objection to such regulation or order and no evidence in support of any objection thereto shall be considered by the court, unless such objection shall have been set forth by the complainant in the protest or such evidence shall be contained in the transcript. It further provides, however, that if application be made to the court by either party for leave to introduce additional evidence which could not reasonably have been offered to the Administrator, and the court determines that such evidence should be admitted, the court shall order the evidence to be presented to the Administrator, and that the Administrator shall promptly receive the same, and such other evidence as he deems necessary or proper, and thereupon he shall certify and file with the court a transcript thereof and any modification made in the regulation or order as a result thereof. It further provides that no such regulation or order shall be enjoined or set aside, in whole or in part, unless the complainant establishes to the satisfaction of the court that the regulation or order is not in accordance with law, or is arbitrary or

capricious, and that the effectiveness of a judgment of the court enjoining or setting aside, in whole or in part, any such regulation or order shall be postponed until the expiration of 30 days from the entry thereof, except that if a petition for a writ of certiorari is filed with the Supreme Court within such 30 days, that the effectiveness of such judgment shall be postponed until an order of the Supreme Court denying such petition becomes final, or until other final disposition of the case by the Supreme Court.

Section 204(c) of the Act provides that the Emergency Court of Appeals shall have the powers of a District Court with respect to the jurisdiction conferred on it by the Act, except that the court shall not have power to issue any temporary restraining order or interlocutory decree staying or restraining, in whole or in part, the effectiveness of any regulation or order.

Section 204(d) of the Act provides that the Emergency Court of Appeals, and the Supreme Court upon a review of judgments and orders of the Emergency Court of Appeals shall have exclusive jurisdiction to determine the validity of any regulation or order and any provision thereof, and that except as provided in such section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation or order, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of the Act authorizing the issuance of such regulations or orders, or any provision of such regulation or order, or to restrain or enjoin the enforcement of any such provision. It further provides that within 30 days after the entry of a judgment or order, interlocutory or final, a petition for a writ of certiorari may be filed in the Supreme Court, and thereupon the judgment or order shall be subject to review by the Supreme Court in the same manner as a judgment of a Circuit Court of Appeals under § 240 of the Judicial Code, as amended, 28 U.S.C.A. § 347.

Section 205(a) of the Act provides that whenever, in the judgment of the Administrator, any person has engaged in or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of § 4 of the Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision.

Section 1300.208 of Procedural Regulation 3 (7 Fed. Reg. 3936) provides that any landlord subject to any provision of a maximum rent regulation or order may file a protest against such provision. Section 1300.209 thereof provides that every protest shall be filed within a period of 60 days after the date of issuance of the regulation or order protested, provided however, that any protest based solely upon grounds arising after the expiration of 60 days after the date of issuance of the regulation or order protested may be filed at any time after the grounds for such protest arise. Section 1300.235 thereof provides that a petition for amendment of a maximum rent regulation may be filed (a) by any person subject to any provision thereof who has failed to file a proper protest within the time specified in § 1300.209; (b) by any other person subject to any provision thereof who proposes an amendment thereof; or (c) by any person who desires modification of any provision thereof by which he is affected, but to which he is not subject. Section 1300.237 thereof provides that the Administrator may afford to the petitioner for amendment and to other persons likely to have information bearing upon such proposed amendment, or likely to be affected thereby, an opportunity to present evidence or argument in support of, or in opposition to, such proposed amendment.

Section 1388.465 of Regulation No. 10 provides that a landlord may file a petition for adjustment to increase the maximum rent otherwise allowable, only on the grounds that: (1) there has been on or after June 1, 1942, a substantial change in the housing accommodations by a major capital improvement as distinguished from ordinary repair, replacement, and maintenance; (2) there was prior to July 1, 1941, and within the six months ending on that date, a substantial change in the housing accommodations by a major capital improvement and the rent on July 1, 1941, was fixed by a lease which was in force at the time of such change; (3) there has been a substantial increase in the services, furniture, furnishings, or equipment provided with the housing accommodations since the date of the order determining its maximum rent; (4) the rent on the date determining the maximum rent was materially affected by the blood, personal, or other special relationship between the landlord and the tenant and as a result was substantially lower than the rent generally

prevailing in the defense-rental area for comparable housing accommodations on July 1, 1941; (5) there was in force on July 1, 1941, a written lease, which had been in force for more than one year on that date, requiring a rent substantially lower than the rent prevailing in the defense-rental area for comparable housing accommodations on July 1, 1941; (6) the rent on the date determining the maximum rent was established by a written lease which provided for a substantially higher rent at other periods during the term of the lease; and (7) the rent on the date determining the maximum rent was substantially lower than at other times of year by reason of seasonal demand for such housing accommodations.

The question immediately before us is whether Kimmel is entitled to relief upon her counterclaim.

I. The Constitutional Basis of the Act.

The Price Control Act is a "statute born of the exigencies of war."[5] Its constitutional basis is found in Art. 1, § 8, of the Constitution, which in part reads as follows:

"The Congress shall have Power to lay and collect Taxes, * * * to pay the Debts and provide for the common Defence and general Welfare of the United States; * * *

"To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

"To raise and support Armies, * * *;

"To provide and maintain a Navy;

"To make Rules for the Government and Regulation of the land and naval Forces;

"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; * * *

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, * * *."

The war power is a broad and comprehensive grant. It is "well-nigh limitless."[6] It must be in order to insure the preservation of the nation and the perpetuity of our liberties.[7]

Of course, it is subject to the limitations of the Fifth Amendment but as was said by former Chief Justice Hughes "That power, explicitly conferred and absolutely essential to the safety of the Nation is not destroyed or impaired by any later provision of the Constitution, or by any one of the amendments. These may be all construed so as to avoid making the Constitution self-destructive, so as to preserve the rights of the citizen from unwarrantable attack, while assuring beyond all hazard, the common defense and the perpetuity of our liberties. They rest upon the preservation of the Nation."[8]

We are now engaged in a global war requiring a total effort to preserve our nation and our freedoms. No greater emergency has ever confronted our nation. In such a time a nation that may draft its young men into the armed forces to serve at a modest

[5] Scripps-Howard Radio, Inc., v. Federal Communications Commission, 316 U. S. 4, 17, 62 S.Ct. 875, 883, 86 L.Ed. 1229.

[6] United States v. Macintosh, 283 U.S. 605, 624, 51 S.Ct. 570, 575, 75 L.Ed. 1302.

[7] In United States v. Macintosh, 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L. Ed. 1302, the court said:

"From its very nature the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams, 'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by

seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; *prices of food and other necessities of life fixed or regulated;* railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war." (Italics ours.)

[8] "The Fighting Powers of the United States Under the Constitution," 55 Cong. Rec., pt. 8, pp. 551–555.

642

pay most certainly can require its citizens on the home front to make financial and other sacrifices essential to the successful defense of our country.

■ The national emergency of war does not create power. The war power is expressly granted. The emergency furnishes the occasion for the exercise of power. In Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413, 88 A.L.R. 1481, the court said:

"'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' Wilson v. New, 243 U.S. 332, 348, 37 S.Ct. 298, 302, 61 L.Ed. 755, L.R.A.1917E, 938, Ann.Cas.1918A, 1024. The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. Thus, the war power of the federal government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties."

That rent control is necessary to the effective prosecution of the war effort is not open to doubt. It is necessary in order to prevent the disastrous effects of inflation, to protect the families of men in the armed service, to attract workers to vital defense areas, to bring about a fair distribution of essential labor among the several defense areas, and to insure defense workers of housing accommodations at rentals that are not exorbitant. In short, it is necessary to maintain civilian morale and insure the production of necessary armaments.

■ It must follow that Congress has the power to regulate the costs of commodities and facilities in order to insure the essential armaments, prevent defeat, and insure the victory. Indeed, the power to regulate rents was sustained by the Supreme Court in Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165. We think there is no substantial difference in the requirement of the Act there

involved that the rent should be "fair and reasonable", 41 Stat. 300, § 106, and the provision of the instant Act that the maximum rent fixed shall be "generally fair and equitable."

In Highland v. Russell Car & Snow Plow Company, 279 U.S. 253, 262, 49 S.Ct. 314, 316, 73 L.Ed. 688, the court said: "The Congress and the President exert the war power of the nation, and they have wide discretion as to the means to be employed successfully to carry on."

If the Act is an appropriate means to a permitted end there is little scope for the operation of the Due Process Clause.[9]

II. Delegation of Legislative Power.

■ Here, the Act contains both a clear statement of a definite policy of Congress and adequate intelligible standards to guide the Administrator in fixing minimum rental. The objectives of the Act are set forth in § 1(a) in meticulous detail. Such rent regulations can only apply to defense-area accommodations. Defense-Rental areas are only those located where the Administrator finds defense activities have resulted or threaten to result in an increase in rents inconsistent with the purposes of the Act. The regulation or order must be generally fair and equitable and must effectuate the purposes of the Act. A basic date of April 1, 1941, is set up for the guidance of the Administrator in determining the appropriate maximum rent. A different basic date not earlier than April 1, 1940, may be adopted if, prior or subsequent to April 1, 1941, defense activities shall have resulted or threaten to result in increases in rents for housing accommodations in defense areas inconsistent with the purposes of the Act. The Administrator is required to make adjustments for such relevant factors as he may determine and deem to be of general applicability in respect to housing accommodations, including increases or decreases in property taxes and other costs.

■ Congress must state, in so far as is reasonably practicable, the purpose which it seeks to accomplish and the standards by which that purpose is to be worked out. It may then constitutionally delegate to an administrative agency the powers to determine the details essential to carry out the legislative purpose.[10]

[9] Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 558, 57 S.Ct. 592, 81 L.Ed. 789.

[10] In United States v. Rock Royal Co-

operative, Inc., 307 U.S. 533, 574, 59 S.Ct. 993, 1013, 83 L.Ed. 1446, the court said:

"From the earliest days the Congress

## III. Review.

The Act provides a remedy against an order or regulation which is not in accordance with law, not fair and equitable, or is arbitrary or capricious, by filing a protest in accordance with § 203. The protest is filed with the Administrator and is acted upon in the first instance by him. If the landlord is dissatisfied with the action taken by the Administrator, he may appeal directly to the Emergency Court of Appeals. The decisions of that court are reviewable in the Supreme Court by a proceeding for certiorari.

At every procedural step, full protection is given to the landlord's rights in the matters of presentation, proof, and rebuttal before the Administrator and in the Emergency Court of Appeals.

Under § 2(c) of the Act the Administrator may provide for adjustments and reasonable exceptions. This remedy must be pursued in the first instance before the Administrator with a right of review thereafter in the Emergency Court of Appeals. The Act places no time limit within which a petition for adjustment may be filed. It may be filed and acted upon in the Area Rent Office. Seven general grounds for adjustment are set forth in Regulation No. 10. The chief distinction between the rem-

edy by protest and that by petition for adjustment is that the former challenges the general validity of the regulation, while the latter seeks relief to the individual landlord without challenging the validity of the regulation.

The landlord may also file a petition for amendment of the rent regulation. Such petition may be filed at any time. The petitioner may submit supporting affidavits. This is an additional administrative remedy afforded by Procedural Regulation 3, not required by the Act.

■ It would seem, therefore, that the Act provides for an adequate administrative and judicial review of protests and petitions for adjustment filed in behalf of the landlord.

Counsel for Kimmel urge that she is entitled to an independent judicial determination of both facts and law upon the issue of confiscation.

We pass the question whether an individual landlord may raise the issue of consequential injury where the maximum rental fixed is generally fair and equitable.[11] As stated above, the statute was "born of the exigencies of war." Individual suffering and sacrifice are inevitable concomitants of war. They may be ameliorated

---

has been compelled to leave to the administrative officers of the Government authority to determine facts which were to put legislation into effect and the details of regulations which would implement the more general enactments. It is well settled, therefore, that it is no argument against the constitutionality of an act to say that it delegates broad powers to executives to determine the details of any legislative scheme. This necessary authority has never been denied. In dealing with legislation involving questions of economic adjustment, each enactment must be considered to determine whether it states the purpose which the Congress seeks to accomplish and the standards by which that purpose is to be worked out with sufficient exactness to enable those affected to understand these limits. Within these tests the Congress needs specify only so far as is reasonably practicable."

See, also, Opp Cotton Mills, Inc., v. Administrator, 312 U.S. 126, 145, 61 S.Ct. 524, 85 L.Ed. 624; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 398, 60 S.Ct. 907, 84 L.Ed. 1263.

In Opp Cotton Mills, Inc., v. Adminis-

trator, supra [312 U.S. 126, 61 S.Ct. 533], the court said:

"The factors to be considered in arriving at these determinations, both those specified and 'other relevant factors', are those which are relevant to or have a bearing on the statutory objective. The fact that Congress accepts the administrative judgment as to the relative weights to be given to these factors in each case when that judgment in other respects is arrived at in the manner prescribed by the statute, instead of attempting the impossible by prescribing their relative weight in advance for all cases, is no more an abandonment of the legislative function than when Congress accepts and acts legislatively upon the advice of experts as to social or economic conditions without re-examining for itself the data upon which that advice is based."

[11] Knox v. Lee, 12 Wall. 457, 551, 20 L.Ed. 287; Block v. Hirsh, 256 U.S. 135, 155–158, 41 S.Ct. 458, 65 L.Ed. 885, 16 A.L.R. 165; Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 156, 157, 40 S.Ct. 106, 64 L.Ed. 194; Jacob Ruppert v. Caffey, 251 U.S. 264, 303, 40 S.Ct. 141, 64 L.Ed. 260.

with respect to price and rent regulations by equitable legislation and just administration, but it is doubtful if they can be wholly eliminated. But if a regulation is subject to challenge on the ground that, though generally fair and equitable, it will result in confiscation of an individual landlord's property, in that it will not afford him a fair return on its value, we think the Act provides for an independent judicial determination of both facts and law by the Emergency Court of Appeals. That court is authorized to set aside a regulation which is not fair and equitable, not in accordance with law, or is arbitrary or capricious. While the evidence in the first instance must be submitted to and passed on by the Administrator, the Emergency Court of Appeals is authorized to permit the introduction of additional evidence before the Administrator after complaint has been filed with that court and we find nothing in the Act limiting the power of the Emergency Court of Appeals to review the facts. The rules adopted by the Emergency Court of Appeals provide a full opportunity for the filing of briefs and for oral argument. S.Ct. Rules 21, 24, 28 U.S.C.A. following section 354.

IV. Exclusive Jurisdiction and Stay.

 Section 204(d) of the Act places two limitations on the jurisdiction of this court. First, under that section no court, except the Emergency Court of Appeals and the Supreme Court, may consider the validity of, stay, restrain, enjoin, or set aside any provision of a maximum rent regulation. Second, no court, except the Emergency Court of Appeals and the Supreme Court, may stay, restrain, enjoin or set aside any provision of the Act, or restrain or enjoin the enforcement of a maximum rent regulation. It follows that if the Act is constitutional, this court is without jurisdiction to pass on the validity of Regulation No. 10 and is limited in its consideration to the question of the constitutionality of the Act.

 The exclusive jurisdiction and the prohibition against a stay are indispensable to the successful operation of wartime rent control. They are designed for the protection of the public interest through the maintenance of uninterrupted control in all areas subject to maximum rent regulations pending the completion of orderly review proceedings. Were the validity of the regulation subject to review and stay by statutory three-judge courts in the several judicial districts throughout the United States, control might be interrupted and rents allowed to soar at any time in any defense-rental area. Release of control in one area while it remains in effect in another would be disastrous to the program. It would destroy its essential equilibrium. It would result in pressure on workmen to move out of uncontrolled defense areas in order to obtain shelter in areas where rents are lower or still under control. There would be a corresponding inability to secure labor for necessary war productions where control was stayed or interrupted. Release of the forces of inflation in one or more areas would have an inflationary effect throughout the nation. Hence, control of rent inflation in wartime cannot accomplish its purpose unless it is effective throughout the nation from the very outset and continues to be effective while normal administrative remedies are being applied and judicial consideration of the program is being completed. It must not be permitted to get out of hand in a particular area or areas. No bond or deposit could safeguard the incalculable values, both public and private, which are at stake when inflationary controls are challenged in wartime. No price can be placed upon military needs and national morale. Hence, the Congress wisely recognized that the national safety demands continuity of price and rent control until, in pursuance of an orderly course of proceedings, a decision of the highest court of the land has been had upon the supremely important questions of fact and law involved, and appropriately provided for an exclusive jurisdiction, and that there should be no stay of the Act, of a regulation, or order pending review. While the inhibition against the granting of the stay until a final decision by the Supreme Court deprives the courts of an historic power—a power as old as the judicial system of the nation,[12] it is deprivation of jurisdiction essential to the successful operation of rent control for the reasons we have heretofore adverted to and is justified under the war power, to insure the safety of the nation and the perpetuation of our liberties. Moreover, a stay is not a matter of right, even if irreparable injury might otherwise result. It is an ex-

[12] Scripps-Howard Radio, Inc., v. Federal Communications Commission, 316 U.S. 4, 17, 62 S.Ct. 875, 86 L.Ed. 1229.

645

ercise of judicial discretion and the propriety of its issue ordinarily depends on the circumstances of each case. The considerations we have adverted to would warrant a court in denying a stay and in our judgment warranted the Congress in denying the power to grant the stay. Congress had the power to impose the duty to obey first and litigate afterwards.[13]

The power of Congress to take jurisdiction over these matters away from the District Courts and vest it in the Emergency Court of Appeals and the Supreme Court cannot be doubted. The inferior Federal courts are creatures of Congress. They can exercise only such jurisdiction as Congress confers upon them. Congress, in its unfettered discretion, may withhold or take away their jurisdiction.[14]

Furthermore, in a matter as complex and far-reaching as a rent control program, the necessity for administrative flexibility is apparent. The administrative process is peculiarly adapted to effectuate modifications, adjustments, and amendments that will result in fair and equitable regulation of rentals. Precision in adjustment or modification to meet the needs of a defense-area community is only possible within the framework of the administrative process. A court might pass upon the validity or invalidity of the regulation and might stay its enforcement. It could not make the adjustments or modifications appropriate in any particular case.

Finally, Kimmel has not exhausted her administrative remedies. It is a settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.[15] It, therefore, may be doubted that Kimmel is entitled to press her constitutional challenge as a basis for relief upon her counterclaim.[16]

We conclude that the basic act is constitutional. It follows that Kimmel should have sought relief through a protest or a petition for adjustment and if ag-

grieved by the administrative decision through a complaint filed with the Emergency Court of Appeals and that this court has no power to award her any relief upon her counterclaim.

The application for a temporary injunction on the counterclaim will be denied.

[13] See Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289.

[14] Kline v. Burke Construction Company, 260 U.S. 226, 233, 234, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077; Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 48, 58 S.Ct. 459, 82 L.Ed. 638.

[15] Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50, 58 S.Ct. 459, 82 L.Ed. 638.

[16] Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 443, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; Anniston Mfg. Co. v. Davis, 301 U.S. 337, 354, 355, 57 S.Ct. 816, 81 L.Ed. 1143; Plymouth Coal Co. v. Commonwealth of Pennsylvania, 232 U.S. 531, 544, 545, 34 S.Ct. 359, 58 L.Ed. 713.