### PORTER v. SHIBE et al.

### SAME v. DARLINGTON, Inc., et al.

#### Nos. 3393, 3403.

Circuit Court of Appeals, Tenth Circuit.

Nov. 5, 1946.

Irving M. Gruber, Chief, Gen. Litigation Branch, of Washington, D. C. (George Moncharsh, Dep. Admin. for Enforcement, David London, Director, Litigation Div., Leanora S. Gruber, Atty., Jacob W. Rosenthal, Atty., Office of Price Administration, all of Washington, D. C., Max D. Melville and William W. McNeill, Regional Litigation Attys., both of Denver, Colo., Office of Price Administration, and Glen V. Graf, Atty., of Kansas City, Mo., Office of Price Administration, on the brief), for appellant.

Paul L. Thomas and Walter G. Klamm both of Kansas City, Kan., for appellees Agnes and Arthur Shibe.

Victor A. Miller, of Denver, Colo., for appellees Darlington, Inc., and others.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

In No. 3393 the facts are these:

The Shibes are the owners of premises, commonly known as 1412 Freeman Avenue, Kansas City, Kansas. A two-room apartment on the first floor of such premises was occupied by A. Miller and his wife, as tenants from week to week. On July 9, 1946, Arthur Shibe personally served upon Miller a written notice to terminate the tenancy on July 22, 1946. The rent was due on that date. The Millers did not vacate the premises. On July 27, 1946, the Shibes served upon Miller a three-day notice, in compliance with the laws of Kansas, that a peaceable entry and forcible detainer action would be filed against them. On August 1, 1946, the Shibes filed such action against the Millers in the City Court of Kansas City, Kansas. The cause came on for trial on August 7, 1946. Both the Shibes and Millers were represented by counsel at the

trial, and John Clark, Junior Area Rent Attorney for the Office of Price Administration, appeared in behalf of the Area Rent Office. The City Court found that the Shibes had complied with the laws of Kansas, and that under such laws the Shibes were entitled to possession, and entered a judgment awarding them possession.

Thereafter, the Office of Price Administration instituted proceedings in the United States District Court for the District of Kansas, seeking an injunction against the Shibes' evicting the Millers from the apartment. The trial court denied the preliminary injunction. A judge of this court granted a temporary restraining order. The Administrator appealed from the order denying the temporary injunction.

In No. 3403 the facts are these:

The Darlington, Inc., is the owner of the Darlington Apartment Building situated in Denver, Colorado. Prior to June 30, 1946, C. B. King and his wife were tenants in an apartment in the building. The maximum rent for the apartment was $40 per month, which included the furnishing of cooking gas by the landlord. On July 5, 1946, Darlington served a notice on the tenants terminating the rental agreement on July 15, 1946, and demanding that the tenants leave the premises on or before that date. The rental agreement contained the following provision: "Tenant agrees that upon failure to vacate in due time, upon rightful and legal notice from the Owner so to do, or upon abandonment, or in order to take possession of property above liened, Owner or its agent may re-enter and take possession without suit, using such force as may be necessary for that purpose without liability, and without impairing any security or present or future right of action held by Owner for rent."

Under Colorado law, where a lease contains such a provision, the landlord may enter and remove the tenant upon covenant broken if he uses no unnecessary force to accomplish the purpose.[1] Representatives of Darlington undertook to evict the Kings upon the expiration of the notice period. King physically resisted eviction. On the

morning of July 25, 1946, the maintenance man for Darlington found the valve in the gas line to the apartment leaking and in need of repairs, and turned off the gas. On August 6, 1946, the Administrator brought this action for a mandatory injunction restraining Darlington from decreasing or eliminating the services provided on the date determining the maximum rent applicable to the apartment and from removing or attempting to remove the Kings from the apartment. A temporary restraining order requiring Darlington to restore the gas service was issued on August 9, 1946, and pursuant thereto Darlington turned the gas on again. The restraining order was vacated and a preliminary injunction denied on August 20. Darlington, however, agreed to allow the gas to remain on until the decision on this appeal. The Administrator has appealed from the order denying the preliminary injunction.

The Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., expired on June 30, 1946. By Public Law 548, approved July 25, 1946, it was extended to June 30, 1947. Section 18 of that Act in part provides: "Sec. 18. (1) The provision of this Act shall take as effect of June 30, 1946, and (2) all regulations, orders, price schedules, and requirements under the Emergency Price Control Act of 1942, as amended * * * and the Stabilization Act of 1942, as amended, which were in effect on June 30, 1946, shall be in effect in the same manner and to the same extent as if this Act had been enacted on June 30, 1946, * * *: Provided further, That no act or transaction, or omission or failure to act, occurring subsequent to June 30, 1946, and prior to the date of enactment of this Act shall be deemed to be a violation of the Emergency Price Control Act of 1942, as amended, or the stabilization Act of 1942, as amended, or of any regulation, order, price schedule, or requirement under either of such Acts: * * *." 50 U.S.C.A.Appendix, § 901a note.

It is clear from this section that Congress intended to make such Acts, and the Regulations which had been promulgated thereunder, retroactive to June 30,

[1] Goshen v. People, 22 Colo. 270, 44 P. 503.

1946, with the proviso that there should be no civil or criminal liability for any act, transaction, omission, or failure to act, occurring subsequent to June 30, 1946, and prior to July 25, 1946.

It is clear that in both cases, the tenants, in the interim between June 30, 1946, and July 25, 1946, lost their right to continue in the occupancy of the leased premises under their leases and under state law.

The applicable Regulations made effective from June 30, 1946, are set forth in the margin.[2]

It will be observed that, under such Regulations, the landlord, where there is an immediate compelling necessity, may recover possession of the housing accommodations for use and occupancy as a dwelling for himself, and that a purchaser may acquire possession of the housing accommodations, and that the landlord may evict the tenant for failure to pay rent, for the tenant's refusal of access to the landlord, for violation of an obligation of his tenancy, for the commission of nuisance by the tenant, or for permitting the housing ac-

---

[2] Sections 6(a) and (b) of the Rent Regulations, which were made retroactive by the Act of July 25, 1946, in part provide:

"§ 6. Removal of tenant—(a) *Restrictions on removal of tenant.* So long as the tenant continues to pay the rent to which the landlord is entitled, no tenant shall be removed from any housing accommodations, by action to evict or to recover possession, by exclusion from possession, or otherwise, nor shall any person attempt such removal or exclusion from possession, notwithstanding that such tenant has no lease or that his lease or other rental agreement has expired or otherwise terminated, * * * unless:

"(1) *Tenant's refusal to renew lease.* The tenant, who had a written lease or other written rental agreement, has refused upon demand of the landlord to execute a written extension or renewal thereof for a further term of like duration, or if the lease was for a term of less than one year but more than three months and was non-seasonal in character, for a term of not more than one year, for a rent not in excess of the maximum rent, but otherwise on the same terms and conditions as the previous lease or agreement, except insofar as such terms and conditions are inconsistent with this regulation; or

"(2) *Tenant's refusal of access to landlord.* The tenant has unreasonably refused the landlord's access to the housing accommodations for the purpose of inspection or of showing the accommodations to a prospective purchaser, mortgagee, or prospective mortgagee, or other person having a legitimate interest therein: * * *

"(3) *Violating obligation of tenancy or committing nuisance.* The tenant (i) has violated a substantial obligation of his tenancy, other than an obligation to pay rent, and has continued, or failed to cure, such violation after written notice by the landlord that the violation cease, or (ii) is committing or permitting a nuisance or is using or permitting a use of the housing accommodations for an immoral or illegal purpose; * * *

"(6) *Occupancy, by landlord.* The landlord owned, or acquired an enforceable right to buy or the right to possession of, the housing accommodations prior to the effective date of regulation (or prior to October 20, 1942 where the effective date of regulation is prior to that date, * * * ), and has an immediate compelling necessity to recover possession of such accommodations for use and occupancy as a dwelling for himself, or has served during the period of the war emergency in the armed forces of the United States and in good faith seeks possession for his own occupancy. * * *

"(b) *Administrator's certificate—(1) Removals not inconsistent with Act or regulation.* No tenant shall be removed or evicted on grounds other than those stated above unless, on petition of the landlord, the Administrator certifies that the landlord may pursue his remedies in accordance with the requirements of the local law. The Administrator shall so certify if the landlord establishes that removals or evictions of the character proposed are not inconsistent with the purposes of the Act or this regulation and would not be likely to result in the circumvention or evasion thereof. * * *

"(2) *Occupancy by purchaser.* A certificate shall be issued authorizing the pursuit of local remedies to remove or evict a tenant of the vendor, for occupancy by a purchaser who has acquired his rights in the housing accommodations on or after the effective date of regulation (or on or after October 20, 1942 where the effective date of regulation is prior to that date, * * * ), only as provided in this paragraph (b) (2) * * * ."

commodations to be used for an illegal or immoral purpose.

■■■ The standard laid down by the Act is fair and equitable rent, and where the rent fixed is not fair and equitable, the landlord has administrative remedies open to him. We must assume, therefore, that the maximum rentals fixed for the housing accommodations here involved are fair and equitable.

■■■ Of course, we cannot pass on the validity of the Regulations per se.[3] But we can pass on the validity of the Act of Congress which made the Regulations effective retroactively.[4]

■■■ The Act of July 25, 1946, was enacted by the Congress in the exercise of its war power. The war power is a broad and comprehensive grant. It is "well-nigh limitless."[5] It embraces those powers necessary to maintain our national defense and security. It is essential to the preservation of our country as an independent nation and the perpetuity of our liberties. While the war power is subject to the limitations of the Fifth Amendment,[6] the courts must guard against impairing its essential attributes or endangering the ability of the nation to maintain its defense and security and its status as a free and independent state.

Under the Regulations, unless the landlord seeks recovery of possession of the leased premises for use and occupancy as a dwelling for himself, or a purchaser of the leased premises from the landlord seeks occupancy thereof for himself, the landlord must continue to rent to his former tenant although the latter's lease has expired, his right to occupancy has expired, or he is subject to removal from the premises under state law, so long as the tenant pays the rent fixed by the Administrator and does none of the things affording ground for eviction under the provisions of the Regulations. Thus, it will be seen that the effect of the Regulations is to deprive the owner of the right of possession of the leased premises to which he would otherwise be entitled, except in case he desires possession for his own occupancy, or a purchaser thereof desires them for his own occupancy. For that deprivation, the Regulations provide for the payment of fair and equitable rent to the owner and afford protection to the owner's interest against wrongful acts of the tenant.

We do not see any material difference in cases where the Regulations operate retrospectively and where they apply prospectively to a tenant whose lease has expired, or who has otherwise lost his right to occupancy under the terms of the lease or of state law. In either case, the question is whether the Regulations deprive the landlord of his right of possession without due process of law and without just com-

---

[3] Lockerty v. Phillips, 319 U.S. 182, 187–189, 63 S.Ct. 1019, 87 L.Ed. 1339; Yakus v. United States, 321 U.S. 414, 429, 64 S.Ct. 660, 88 L.Ed. 834.

[4] Case v. Bowles, 327 U.S. 92, 98, 66 S.Ct. 438; Yakus v. United States, 321 U.S. 414, 431, 64 S.Ct. 660, 88 L.Ed. 834.

[5] See United States v. Macintosh, 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L.Ed. 1302, where the court said: "From its very nature, the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams,—'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war."

[6] Henderson v. Kimmel, D.C.Kan., 47 F.Supp. 635, 641; United States v. L. Cohen Grocery Co., 255 U.S. 81, 88, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045.

pensation in violation of the Fifth Amendment.

For the use of the housing accommodation, fair and equitable rent is just compensation.

The due process guaranty of the Fifth Amendment demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.[7]

If the statute is an appropriate means to a permitted end, there is little scope for the operation of the due process clause.[8]

The Regulations here involved adequately protect the landlord's interests. They are not unreasonable, arbitrary, or capricious, and they have a real and substantial relation to the object sought to be attained, namely, the protection of the national defense and security by preventing inflation and its consequences, and the making of housing accommodations available in defense-rental areas at non-inflationary rentals.

Hence, we conclude that the Regulations do not deprive the landlord of his right of possession, without due process of law or without just compensation.[9]

Rent Regulation § 3 in part reads: " * * * every landlord shall, as a minimum, provide with housing accommodations the same essential services, * * * as those provided on the date determining the maximum rent, * * *."

May Darlington be required to restore the cooking gas service?

It is suggested by counsel in No. 3403 that, under Colorado law, Darlington might lawfully have removed the doors and windows in the apartment, or even have torn down the apartment[10] during the period between June 30, and July 25, 1946, and had it done so, it could not now be constitutionally required to restore the leased premises. Obviously, a requirement that would involve substantial outlays by Darlington, and for which it would receive no compensation, differs materially from the situation here presented. The turning on of the gas involves merely the opening of a valve in the supply line and the cost thereof, if any, to Darlington would be trivial.

When applied to the facts here presented, to construe Regulation § 3 as applicable to a service discontinued between June 30, and July 25, 1946, would not, in our opinion, render the Act of July 25, 1946, unconstitutional.

A law is not unconstitutional merely because it results in financial injury to a citizen where it is reasonably necessary to preserve important public interests. Neither is it unconstitutional because it preserves one interest over another if there is a preponderant public concern in the preservation of the one over the other.[11] Here, the important national interest is the making available to tenants of housing accommodations in important defense-rental areas at non-inflationary rentals in furtherance of the national defense and security.[12]

Many of the lawful demands made on the citizen in the exercise of the war power result in financial loss to the citizen. Individual suffering and sacrifice are inevitable concomitants of war.[13] Moreover, here the financial injury is nominal only and not substantial.

---

[7] Nebbia v. People of State of New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; North American Co. v. Securities and Exchange Commission, 2 Cir., 133 F.2d 148, 154.

[8] Virginian R. v. System Federation No. 40, 300 U.S. 515, 558, 57 S.Ct. 592, 81 L.Ed. 789.

[9] Cf. People v. La Fetra, 230 N.Y. 429, 130 N.E. 601, 16 A.L.R. 152; Guttag v. Shatzkin, 230 N.Y. 647, 130 N.E. 929.

[10] See Howe v. Frith, 43 Colo. 75, 95 P. 603, 605, 17 L.R.A.,N.S., 672, 127 Am.St.Rep. 79, 15 Ann.Cas. 1069; Cf. Page v. Yool, 28 Colo. 464, 65 P. 636.

[11] Yakus v. United States, 321 U.S. 414, 439, 440, 64 S.Ct. 660, 88 L.Ed. 834; Miller v. Schoene, 276 U.S. 272, 279, 280.

[12] See Henderson v. Kimmel, D.C.Kan., 47 F.Supp. 635, 642.

[13] Henderson v. Kimmel, D.C.Kan., 47 F.Supp. 635, 643.

The causes are reversed and remanded, with instructions to vacate the orders denying injunctive relief and to proceed further in accordance with the views herein expressed.