[S. F. No. 16905. In Bank. Sept. 30, 1943.]

BRADSTREET MILLER, JR., Petitioner, v. MUNICIPAL COURT OF THE CITY OF LOS ANGELES et al., Respondents; PRENTISS M. BROWN, Administrator, Office of Price Administration, Intervener.

Bradstreet Miller, Jr., in pro. per. for Petitioner.

Robert W. Kenny, Attorney General, Chas. W. Johnson,

Deputy Attorney General, Bartley C. Crum and Benjamin Dreyfus as Amici Curiae on Behalf of Petitioner.

J. H. O'Connor, County Counsel, S. V. O. Prichard, Assistant County Counsel, and W. B. McKesson, Deputy County Counsel, for Respondents.

Ben C. Duniway, John T. McTernan, Myer C. Symonds, Frank S. Balthis, Jr., and John J. Ford for Intervener.

EDMONDS, J.—An alternative writ of mandate issued upon the petitions of Bradstreet Miller, Jr., and Prentiss M. Brown, Administrator of the Office of Price Administration, as intervener, commanding the small claims court, a division of the Municipal Court of the City of Los Angeles, to show cause why it should not hear and determine a consumer action authorized by the federal Emergency Price Control Act of 1942 (56 Stats. 23; 50 U.S.C.A.,App., secs. 901-946). In response to the writ, the court, answering in its name and that of the judge who made the order complained of, asserts that it has no jurisdiction of the action, and the questions for decision concern the scope and effect of the federal statute's provisions when applied to a proceeding in a state court.

By his petition, Miller alleges that pursuant to section 205(e) of the act he filed an action in the respondent court against Earl O'Farrell to recover the sum of $50 and costs, based upon an asserted overcharge of twenty-five cents for the inspection of automobile tires. This charge was made contrary to section 1315.703 of Ration Order No. IA and Maximum Price Regulation No. 165 issued under the provisions of the act. When the case came on for trial, the petition continues, the court declared that it had no jurisdiction of such an action and ordered it off calendar.

The petitioner asserts that the small claims court, which has jurisdiction of actions for the recovery of money where the amount claimed does not exceed $50, is a proper tribunal in which to bring his action. For one may sue in a state court to enforce a right existing under federal law, and the Emergency Price Control Act of 1942 authorizes a consumer action to be brought in a state court of competent jurisdiction. Section 256 of the United States Judicial Code (28 U.S.C.A., sec. 371) giving federal courts exclusive jurisdiction of suits

for a "penalty" is no obstacle to the state court's jurisdiction, for, even if the action were to be regarded as one for a penalty, the Emergency Price Control Act of 1942, being later in time, operated as a *pro tanto* repeal of that section. But, he insists, a consumer action under section 205(e) is not an action for a penalty, although, even if it be considered such, a state court cannot refuse to take jurisdiction of it. He also claims that section 205(e) does not make it mandatory that the consumer ask for attorney's fees; hence there is no basis for a holding that the amount sued for must, of necessity, exceed the limitation of $50 upon the jurisdiction of the small claims court.

In reply, the respondent court maintains that section 205(e) of the act is a "penal" statute because its controlling purpose is to impose a punishment for the violation of its provisions. And Congress, the argument continues, may not compel the state courts to act as penal enforcement agents of the United States. Finally, it asserts, the Price Control Act of 1942 is unconstitutional because it is an unlawful delegation of legislative power to an administrative official.

Answering the respondent's contentions, the intervener contends that, unlike actions to recover penalties in favor of the United States, penal actions brought by private parties must be enforced in state courts. And he meets the argument of unconstitutionality with the assertion that the respondent court did not refuse to proceed with the trial of the petitioner's action upon that ground but because it claimed to be without jurisdiction. In any event, he says, the constitutionality of the act is established by numerous decisions of the federal courts. Furthermore, the act is a legitimate exercise of the war power of Congress, it is sufficiently definite to satisfy the requirements of the due process clause of the Constitution, and is not invalid as an improper delegation of legislative power because it contains both a clear statement of a definite congressional policy and adequately intelligible standards to guide the administrator in fixing maximum prices. In addition, he contends, the scope of the discretion which Congress may constitutionally accord to the executive branch of the government is increased in time of war.

The challenge to constitutionality presents the most important issues in this original proceeding. And that question

is complicated by certain procedural requirements of the act.

Section 203 (50 U.S.C.A.,App., sec. 923) establishes an administrative procedure by which a person subject to any provision of a regulation, order, or price schedule issued under the act may object to it. Section 204 (50 U.S.C.A.,App., sec. 924) authorizes a review of the administrative determination in a specially-created Emergency Court of Appeals. The decision of that court, in turn, may be reviewed on certiorari by the United States Supreme Court. The section concludes: "The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2 [50 U.S.C.A.,App., sec. 902], of any price schedule effective in accordance with the provisions of section 206 [50 U.S.C.A.,App., sec. 926], and of any provision of any such regulation, order, or price schedule. Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision."

This section was recently considered by the United States Supreme Court in *Lockerty* v. *Phillips,* 319 U.S. 182 [63 S.Ct. 1019, 87 L.Ed. ——] (May 10, 1943). In that case, wholesale meat dealers sued for an injunction in the federal district court to restrain the prosecution of criminal proceedings against them for a violation of the act, including among their contentions the assertion that the statute involved an unconstitutional delegation of legislative power to the Price Administrator. A district court of three judges dismissed the suit for want of jurisdiction. The Supreme Court affirmed the judgment, holding that, in view of section 204, the federal district courts have no jurisdiction to enjoin the enforcement of the act even on the ground of unconstitutionality, but that the dealers must pursue the remedy provided by the act. The court, however, withheld a decision as to whether the constitutionality of the act could be raised in a consumer action, saying: "We have no occasion to de-

termine now whether, or to what extent, appellants may challenge the constitutionality of the Act or the Regulation in courts other than the Emergency Court, either by way of defense to a criminal prosecution or in a civil suit brought for some other purpose than to restrain enforcement of the Act or regulations issued under it." And this reservation, which expressly includes the present proceeding, requires a determination of the question as to whether the constitutionality of the act may be here considered.

### *May this Court Consider the Constitutionality of the Statute?*

The constitutionality of a statute may be attacked in either of two ways. The legislative act may, by its terms, disclose a constitutional violation; on the other hand, an enactment, constitutional on its face, may be unconstitutionally applied. (See *Brock* v. *Superior Court*, 12 Cal.2d 605, 610 [86 P.2d 805]; *Yick Wo* v. *Hopkins*, 118 U.S. 356, 373 [6 S.Ct. 1064, 30 L.Ed. 220].) Having in mind these fundamental principles,. several constructions of section 204 are possible.

(1) It may be argued, with some semblance of merit, that section 203 provides the exclusive way in which the constitutionality of an order, regulation or price schedule, or of any provision of the act, can be questioned by one affected thereby. Consequently, following the rule of exhaustion of administrative remedies, if the defendant in the consumer's action did not challenge the constitutionality of the act and the order which he is charged with violating by the administrative procedure prescribed in the act, he is now foreclosed from raising the question of constitutionality either of the act or of the order.

(2) A contrary interpretation would be that the exclusive jurisdiction provisions of section 204 apply only to a case where the person affected seeks affirmatively, in a proceeding originated by him, to challenge either the validity of an order or the act.

(3) An intermediate view is that the exclusive jurisdiction provisions apply both to a situation where one affected affirmatively challenges the act or an order issued under it and, in an action instituted either by the United States, the Price Administrator, or a consumer, to the question of the validity of an order but not of the validity of the act itself.

■ Although normally the doctrine of exhaustion of administrative remedies requires parties to administrative proceedings to take full advantage of the available administrative remedy, the principles underlying the doctrine have been applied to one who did not invoke that remedy. (*Bourjois* v. *Chapman*, 301 U.S. 183 [57 S.Ct. 691, 81 L.Ed. 1027]; *Highland Farms Dairy* v. *Agnew*, 300 U.S. 608 [57 S.Ct. 549, 81 L.Ed. 855]; *Smith* v. *Cahoon*, 283 U.S. 553 [51 S.Ct. 582, 75 L.Ed. 1264]; *People* v. *Calvar Corp.*, 286 N.Y. 419 [36 N.E.2d 644, 136 A.L.R. 1376]; see 42 Am.Jur., Public Administrative Law, sec. 199, p. 582.) Judicial relief, however, has been held available without requiring exhaustion of administrative remedies where the statute providing the remedies was void on its face. (*Hague* v. *C.I.O.*, 307 U.S. 496 [59 S.Ct. 954, 83 L.Ed. 1423]; *Lovell* v. *Griffin*, 303 U.S. 444 [58 S.Ct. 666, 82 L.Ed. 949]; *Carter* v. *Carter Coal Co.*, 298 U. S. 238 [56 S.Ct. 855, 80 L.Ed. 1160]; *Smith* v. *Cahoon*, 283 U.S. 553 [51 S.Ct. 582, 75 L.Ed. 1264]; *Euclid* v. *Ambler Co.*, 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303]; *Yarnell* v. *Hillsborough Packing Co.*, 70 F.2d 435; *Dowsey* v. *Village of Kensington*, 257 N.Y. 221 [177 N.E. 427, 86 A.L.R. 642]; see 42 Am.Jur., Public Administrative Law, sec. 200, p. 587.) Furthermore, the United States Supreme Court has held, on at least one occasion, that the doctrine does not apply where an administrative determination is attacked in a judicial proceeding by way of defense only (*Clinkenbeard* v. *United States*, 21 Wall. 65 [22 L.Ed. 477]), although such a restricted application of it has been criticized as a "narrow" one (see 42 Am.Jur., Public Administrative Law, sec. 199, p. 583).

That a federal court other than the Emergency Court of Appeals may not pass either upon the validity of the act as written, or upon its validity as applied in the form of an order, regulation or price schedule, in an action originated by the party regulated must be considered settled by the decision in *Lockerty* v. *Phillips, supra*. The court also there decided that one affected by the order may question the validity of the act, apart from any question of unconstitutional application, by way of the administrative procedure and judicial review in the Emergency Court.

Many provisions of the act disclose the congressional policy that the administrative regulations be obeyed while their

validity is being tested. Most significant in this respect are the limitations on the power of the Emergency Court to issue temporary injunctions and the staying of its final judgments pending opportunity for review in the Supreme Court· of the United States. (Sec. 204(b), (c); see Nathanson, *The Emergency Price Control Act of 1942: Administrative Procedure and Judicial Review,* 9 Law and Contemporary Problems 60, 73, 74.) The policy underlying these and the exclusive jurisdictional provisions of the statute would in effect be defeated should a defendant be permitted to raise the constitutional questions in an action to enforce the regulations. For if that could be done, in order to avoid resort to administrative review and subsequent judicial review in the Emergency Court, one need only disobey the order, regulation, or price schedule which he wishes to challenge. On the other hand, consistent with this policy, it might well be urged, Congress intended that one who has failed to contest the validity of either the act or order through resort to the statutory remedy has waived his right to object to its enforcement against him.

So far as the language of the act is concerned, it would seem that the administrative remedy and the procedure for judicial review are provided primarily to give opportunity for challenging the validity of an order, regulation, or price schedule. Thus section 203 includes no mention of an attack upon the statute but specifies, as subject to challenge, rulings made by the Price Administrator applying its provisions. And subdivisions (a), (b), and (c) of section 204 refer only to the validity of a regulation, order, or price schedule.[1] Again the exclusive jurisdiction provision of subdivision (d) declares that "The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation, order, or price schedule." The first mention of the power to pass upon the validity of the act itself comes in the succeeding and concluding sentence of subdivision (d), that no other court "shall have jurisdiction or power . . . to stay, restrain, enjoin, or set aside, in whole or in part, any

---

[1]Subdivision (b), however, authorizes the Emergency Court to enjoin or set aside, in whole or in part, any "regulation, order, or price schedule [which] is not in accordance with law."

provision of this act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any regulation, order, or price schedule, òr to restrain or enjoin the enforcement of any such provision.''

The decision in *Lockerty* v. *Phillips, supra,* that this provision prevents a federal district court from considering the validity of the act on the ground of unlawful delegation of congressional power, was based, in part, upon the fact that the ''Congressional power to 'ordain and establish' inferior courts includes the power of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good.'' Accordingly, said the court, Congress could constitutionally restrict equity jurisdiction to restrain enforcement of the act, or of regulations under it, to the Emergency Court, and could require a plaintiff seeking such equitable relief first to pursue the prescribed administrative procedure.

But the question whether the prohibitory language of subdivision (d), *supra,* takes from a state court the right to determine that, upon grounds of unconstitutionality disclosed by the act, the statute will not be enforced, must be decided in connection with the provision that the United States Constitution ''shall be the supreme law of the land; and the Judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.'' (U. S. Const., art. VI, sec. 2.) May, then, a state court upon which, if the contentions of the petitioner and the intervener are correct, has been conferred jurisdiction to pass upon consumer actions, be foreclosed by congressional mandate from considering the constitutionality of the act which it is to enforce? If Congress, in enacting the Emergency Price Control Act, so intended to restrict the jurisdiction of the courts to which it delegated the duty to entertain such actions, there would be considerable doubt as to the statute's validity, for the decisions indicate that, under the constitutional provision, the judge of a state court may not enforce a statute whose terms are clearly unconstitutional. (See *Marbury* v. *Madison,* 1 Cranch 137 [2 L.Ed. 60] ; *People* v. *Western Union Tel. Co.,* 70 Colo. 90 [198 P. 146, 15 A.L.R. 326] ; *cf. Ohio ex rel. Bryant* v. *Akron Metropolitan Park Dist.,* 281 U.S. 74 [50 S.Ct. 228, 74 L.Ed. 710].)

■ If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. (*Blodgett* v. *Holden*, 275 U.S. 142, 148 [48 S.Ct. 105, 72 L.Ed. 206] ; 16 C.J.S., Constitutional Law, sec. 98, pp. 242-246 ; 2 Sutherland on Statutory Construction [3d ed. 1943], sec. 4509, p. 326.) The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers. ■ That this presumption is supported by fact, so far as the act here challenged is concerned, is indicated by the Senate Report on the bill.[2] This declaration of legislative intention lends certainty to the language of the enactment and compels the conclusion that the words "stay, restrain, enjoin, or set aside" in the closing sentence of subdivision (d) of section 204 prohibit a court, other than the Emergency Court, from entertaining an action brought to determine the constitutionality of the act but do not restrict a court in which an enforcement action has been commenced from deciding that question.[3]

Because of the well-settled rule that a court will ordinarily inquire into the constitutionality of a statute only to the extent required by the case under consideration and will

[2] "Section 204(d) further provides expressly that no court, other than the Emergency Court and the Supreme Court, shall have jurisdiction or power to consider the validity, constitutional or otherwise, of any regulation or order issued under section 2. It also provides that no court, except as provided in section 204, shall have jurisdiction or power to stay, restrain, enjoin, or set aside (whether by declaratory judgment or otherwise) any provision of the bill authorizing the issuance of such regulation or order, or to restrain or enjoin the enforcement of any provision of any such regulation or order. Thus the bill provides for exclusive jurisdiction in the Emergency Court and in the Supreme Court to determine the validity of regulations or orders issued under section 2. Of course, the courts in which criminal or civil enforcement proceedings are brought have jurisdiction, concurrently with the Emergency Court, to determine the constitutional validity of the statute itself." (S.Rep. 931, 77th Cong., 2d Sess.)

[3] Commenting upon the Senate Report, N. L. Nathanson, Asst. Gen. Counsel O.P.A., in his article, *The Price Control Act: Procedure and Judicial Review*, says: "It should also be noted that the 'inherent powers' of courts to determine the validity of statutes which they are asked to enforce are in no way restricted by the exclusive jurisdiction provisions." (9 Law and Contemporary Problems, 60, 76.)

formulate a rule no broader than that necessitated by the precise facts in controversy (see cases collected in 16 C.J.S., Constitutional Law, sec. 94, p. 215, nn. 65, 66), this court withholds any expression of opinion on the question whether or not the defendant in an enforcement proceeding may claim that the act, though constitutional on its face, is invalidly applied to him. Certainly, the presentation for judicial consideration of complicated data underlying the validity of the regulations, orders, or price schedules would tend to make · speedy enforcement impossible and would place heavy demands upon the time of the personnel of the Office of Price Administration. (See Nathanson, op. cit., p. 75.) And it may be reasonable to conclude that the failure to exhaust an administrative remedy constitutes a waiver of the right to object to the application of the order, regulation or price schedule. On the other hand, the question of whether the act, as applied to the individual, conforms to constitutional due process in giving the one regulated adequate notice of the existence of the order for which enforcement is sought and sufficient opportunity to be heard or to exhaust his administrative remedy, under the facts of the particular case, is one which a court, particularly in a criminal proceeding, would be reluctant to ignore. The terms of the act are admittedly general in this respect (see sec. 203), and a decision as to their effect should not be made in the absence of any facts showing their application by the Price Administrator to a defendant charged with violation of them.

## Delegation of Legislative Power

Proceeding, then, to a consideration of the respondent's claim that the statute on its face discloses an unconstitutional delegation of legislative power, it is necessary first to ascertain the extent of the power, in the exercise of which the Emergency Price Control Act was passed.

The scope of the war power of Congress has been most broadly described in the dicta of *United States* v. *Macintosh,* 283 U.S. 605, 622[4] [51 S.Ct. 570, 75 L.Ed. 1302]. Although

[4] "From its very nature, the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams,—'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit

counsel for the respondent are correct in their assertion that extraordinary conditions do not create or enlarge constitutional power, the Supreme Court of the United States has more than once declared that such conditions must be considered in determining the constitutional scope of congressional authority. (*Home Bldg. & L. Assn.* v. *Blaisdell,* 290 U.S. 398, 426 [54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481] ; *Knox* v. *Lee,* 12 Wall. [79 U.S.] 457 [20 L.Ed. 287] ; *Juilliard* v. *Greenman,* 110 U.S. 421 [4 S.Ct. 122, 28 L.Ed. 204] ; see Corwin, Constitutional Revolution, Ltd., (1941), p. 48.)

■ As was said in *Home Bldg. & Loan Assn.* v. *Blaisdell, supra,* ". . . the war power of the Federal Government is not created by the emergency of war, but it is a power given to meet that emergency." It is a power "not limited to victories in the field" (*Stewart* v. *Kahn,* 11 Wall. 493, 507 [20 L.Ed. 176] ; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U.S. 146, 161 [40 S.Ct. 106, 64 L.Ed. 194]), and, in order to wage war successfully, "permits the harnessing of the entire energies of the people in a supreme cooperative effort to preserve the nation." (*Home Bldg. & L. Assn.* v. *Blaisdell, supra,* at p. 426.) As recently stated by Mr. Chief Justice Stone, the war power "extends to every matter and activity so related to war as substantially to affect its conduct and progress." (*Hirabayashi* v. *United States,* 320 U.S. 81 [63 Sup.Ct. 1375, 87 L.Ed. —— June 21, 1943].)

■ The purpose of the Emergency Price Control Act of 1942 is to further the national defense and security in time of war by checking speculative and excessive price rises, price dislocations, and inflationary tendencies. (Sec. 1(a) ; 50 U.S. C.A., App., sec. 901.) Although the judicial precedents on wartime price control are limited in their conclusions to factors not necessarily universally present in the scheme of price-

---

of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war."

fixing embodied in that statute,[5] economic dislocation on the "home front" would vitally affect the nation's ability to maintain and supply the armed forces of the country in order to wage effective war. The power to control the inflationary rise of prices is a power to avoid the economic dislocation inherent in the special conditions of wartime economy, marked as it is by shortages of materials and machines for civilian production, shortages of labor, extraordinary additions to income from governmental expenditures, and government borrowing which does not siphon off the income and bank deposits of the public. (See discussion in Freund, *The Price Control Act: Constitutional Issues,* 9 Law and Contemporary Problems 77, 78.) Furthermore, although the United States Supreme Court has not yet ruled upon the constitutionality of the act, the Emergency Court of Appeals recently decided that the power to fix maximum rents under the act is within the war power conferred upon Congress by the Constitution. (*Taylor* v. *Brown,* —— F.Supp. —— (July 15, 1943) ; and see *Henderson* v. *Kimmel,* 47 F.Supp. 635.) The right to control prices of commodities is a constitutional aspect of the same power.[6]

█ But the respondents contend that the manner in which Congress has attempted to exercise this power is unlawful in that the act unconstitutionally delegates a legislative function to an administrative officer. However, a court would be required to disregard realities were it to deny that the practice of delegated "legislation" is inevitably and inextricably involved in the scheme of governmental intervention in the economic field, where the conditions to be regulated are of infinite complexity and are constantly undergoing change. To demand that Congress should impose upon this shifting and complex scene the relatively permanent molds of statutory provision, unqualified by a large degree of administrative discretion, would nullify the effective operation of governmental regulation and render it unworkable. (*Opp*

[5]See *Highland* v. *Russell Car & Snow Plow Co.,* 279 U.S. 253 [49 S.Ct. 314, 73 L.Ed. 688]; *Block* v. *Hirsh,* 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865]; *cf. Marcus Brown Holding Co.* v. *Feldman,* 256 U.S. 170 [41 S.Ct. 465, 65 L.Ed. 877], and the dictum in *United States* v. *Macintosh, supra,* p. 622, recognizing a power to fix or regulate "prices of food and other necessities of life"; see Freund, *The Price Control Act: Constitutional Issues,* 9 Law and Contemporary Problems, 77, 82, 83.

[6]As defined by the Act, the term "commodity" includes services "in connection with the operation of any service establishment for the servicing of a commodity." (§ 302(c); 50 U.S.C.A., App., § 942(c).)

*Cotton Mills* v. *Administrator*, 312 U.S. 126, 145 [61 S.Ct. 524, 85 L.Ed. 624]; *United States* v. *Rock Royal Co-op.*, 307 U.S. 533, 574 [59 S.Ct. 993, 83 L.Ed. 1446]; and see discussion in *Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 529, 530 [55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947].) In view of this situation, the United States Supreme Court has reduced the constitutional question to a comparatively simple formula: Congress must state, insofar as is reasonably practicable, considering the nature of the subject matter and the regulation sought, the purpose which it seeks to accomplish and the standards by which that purpose is to be effectuated. It may then constitutionally delegate to an administrative agency the power to determine the details essential to carry out the legislative purpose. (*United States* v. *Rock Royal Co-op.*, *supra; Sunshine A. Coal Co.* v. *Adkins*, 310 U.S. 381 [60 S.Ct. 907, 84 L.Ed. 1263]; *Opp Cotton Mills* v. *Administrator*, *supra*.) The exercise of judgment by an administrative agency will be upheld where it is within the prescribed limits and where the procedure which it is directed to follow and the record of its action "are such that Congress, the courts and the public can ascertain whether the agency has conformed to the standards which Congress has prescribed." (*Opp Cotton Mills, Inc.* v. *Administrator*, *supra*, at p. 144.)

Considering the terms of the challenged statute, the purposes are specificially stated. "It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war," section 1(a) reads, "and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency col-

lapse of values; to stabilize agricultural prices in the manner provided in section 3; and to permit voluntary cooperation between the Government and producers, processors, and others to accomplish the aforesaid purposes." (50 U.S.C.A.,App. §901.)

In section 2 (50 U.S.C.A.,App., sec. 902), are found the standards to be applied by the Price Administrator in effectuating these purposes. In general, whenever "in the judgment of the Price Administrator the price or prices of a commodity or commodities have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act, he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." In establishing a maximum price, the Administrator shall "So far as practicable, . . . ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941" and shall make adjustments for such relevant factors as "Speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941." Each regulation or order must be accompanied by a statement of the considerations involved in its issuance.

Before issuing a regulation or order, again "so far as practicable," the administrator is required to consult with representative members of the affected industry. At the request of "any substantial portion" of an industry affected by an established maximum price the administrator shall "appoint an industry advisory committee, or committees, either national or regional or both," which shall select its own chairman and meet at his call. The committee and the administrator shall consult with respect to the form and contents of the regulation or order, and as to any adjustments therein. However, the administrator is authorized to issue temporary orders or regulations, effective for no more than 60 days, without regard to the foregoing provisions, whenever "in the judgment of the administrator such action is necessary or proper in order to effectuate the purposes of this Act." In addition to certain exceptions in favor of agriculture and "any fishery commodity," section 2 includes a limitation that the powers granted the administrator "shall not be used or made to oper-

ate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, except to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act." By section 301, the act provides that the "Administrator from time to time, but not less frequently than once every ninety days, shall transmit to the Congress a report of operations under this Act." (50 U.S.C.A., App., sec. 941.)

These declared purposes and standards are as specific as, or even more definite than, many of the standards upheld in previous decisions by the United States Supreme Court. Thus in *Sunshine A. Coal Co.* v. *Adkins*, 310 U.S. 381 [60 S.Ct. 907, 84 L.Ed. 1263], a delegation of congressional power under the Bituminous Coal Act of 1937 was sustained, where the standards prescribed were that maximum coal prices are to reflect a reasonable return on the fair value of the property and that minimum prices must conform to standards requiring computation of the weighed average cost for each minimum price area and a classification of coal which is just and equitable to producers and which has due regard to the interest of the consuming public. Also in *United States* v. *Rock Royal Co-op.*, 307 U.S. 533 [59 S.Ct. 993, 83 L.Ed. 1446], the court sustained the provision in the Agricultural Marketing Act of 1937 authorizing the Secretary of Agriculture to set minimum milk prices based on parity, but adjusted if parity is unreasonable in view of the price of feed and economic conditions affecting supply and demand. Equally general standards have been approved in many other cases.[7]

---

[7]*National Broadcasting Co.* v. *United States*, —— U.S. —— [63 S.Ct. 997, 1009, 87 L.Ed. ——, ——; *Federal Radio Com.* v. *Nelson Bros. Co.*, 289 U.S. 266 [53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406] ("public convenience, interest, or necessity"); *New York Central Securities Corp.* v. *United States*, 287 U.S. 12 [53 S.Ct. 45, 77 L.Ed. 138] ("in the public interest"); *Chesapeake & Ohio Ry. Co.* v. *United States*, 238 U.S. 35 [51 S.Ct. 337, 75 L.Ed. 824], and *Colorado* v. *United States*, 271 U.S. 153 [46 S.Ct. 452, 70 L.Ed. 878] ("certificates of public convenience and necessity"); *Tagg Bros. & Moorhead* v. *United States*, 280 U.S. 420 [50 S.Ct. 220, 74 L.Ed. 524] ("just and reasonable" commissions); *United States* v. *Chemical Foundation*, 272 U.S. 1 [47 S.Ct. 1, 71 L.Ed. 131] ("in the public interest"); *Mahler* v. *Eby*, 264 U.S. 32 [44 S.Ct. 283, 68 L.Ed. 549] ("undesirable resident"); *Monongahela Bridge Co.* v. *United States*, 216 U.S. 177 [30 S.Ct. 356, 54 L.Ed. 435], and *Union Bridge Co.* v. *United States*, 204 U.S. 364 [27 S.Ct. 367, 51 L.Ed. 523] ("unreasonable obstruction to navigation"); *Buttfield* v. *Stranahan*, 192 U.S. 470 [24 S.Ct. 349, 48 L.Ed. 525] ("purity, quality, and fitness for consumption"); and see Cheadle, *The Delegation of Legislative Functions*, 27 YaleL.Jour., 892, 901.

"Equalization of costs of production" was upheld as an adequate

And insofar as the respondent objects to the action of Congress in allowing the Price Administrator to exercise certain powers when, in his judgment, a specified state of facts exists, the decisions support just such statutory provisions. For example, in *Dakota Central Telephone Co.* v. *South Dakota,* 250 U.S. 163, 181 [39 S.Ct. 507, 63 L.Ed. 910], the court held valid a joint resolution authorizing the President to take over the telephone system of the country "whenever he shall deem it necessary for the national security or defense . . . and to operate . . . [it] in such manner as may be needful or desirable. . . ." Similarly, the Supreme Court approved a delegation of authority to the Secretary of War "to do everything by him deemed necessary to suppress and prevent" prostitution "within such distance" of army centers "as he may deem needful." (*McKinley* v. *United States,* 249 U.S. 397 [39 S.Ct. 324, 63 L.Ed. 668].) And in *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304 [57 S.Ct. 216, 81 L.Ed. 255], the court upheld congressional delegation to the President of the power to prohibit the sale of arms to a country at war, upon his determination that such an embargo would "contribute to the reestablishment of peace."

Considering the detailed specification of the purposes of the act, the requirement that the Administrator establish a maximum price which "will effectuate the purposes of this Act" is a sufficiently definite standard for administrative action. For in the words of the Supreme Court, "Where the policy of an act is so definitely and elaborately stated, this requirement acts as a permitted measure of delegated authority." (*Pittsburgh Plate Glass Co.* v. *National Labor Relations Board,* 313 U.S. 146, 165, 166 [61 S.Ct. 908, 85 L.Ed. 1251]; and see 2 Sutherland on Statutory Construction [3rd ed. 1943] §4820, p. 363.)

Unquestionably, the control of prices by Congress necessarily involves the consideration of factors subject to continual variation and, as a consequence, requires an elastic system of regulation to adjust to such changing conditions.

standard for the administration of the flexible tariff (*J. W. Hampton Jr. & Co.* v. *United States,* 276 U.S. 394 [48 S.Ct. 348, 72 L.Ed. 624]), although Chief Justice Taft, who delivered the court's opinion, had declared when President that "the precise difference in cost of production sought for is not capable of precise ascertainment, and . . . all that even the most scientific person can do in his investigation is, after consideration of many facts which he learns, to exercise his best judgment in reaching a conclusion." (See Freund, *op. cit.,* at p. 86.)

(*Taylor* v. *Brown, supra; United States* v. *C. Thomas Stores, Inc.,* 49 F.Supp. 111, 113.) Measured in the light of these circumstances, it may not be said that Congress has failed to state, insofar as is reasonably practicable, the purpose which it seeks to accomplish by the Emergency Price Control Act of 1942 and the standard by which the Price Administrator is to carry out that purpose. And the requirement that the administrator report to Congress not less frequently than every three months also serves to keep the application of the act in line with congressional intent. The act therefore is not an unconstitutional delegation of legislative powers.

## *Must a State Court Assume Jurisdiction of a Consumer Action?*

In considering whether a state court of competent jurisdiction must entertain a consumer action authorized by the Emergency Price Control Act of 1942, inquiry should first be made as to the intention of Congress in this regard. Section 205(c) provides that the federal district courts "shall have jurisdiction of criminal proceedings for violations of Section 4 of this Act and concurrently with State and Territorial courts, of all other proceedings under Section 205 of this Act." More specifically, section 205(e), authorizing the consumer action, concludes: "Any suit or action under this subsection may be brought in any court of competent jurisdiction . . ." The term "any court of competent jurisdiction" includes state as well as federal courts, at least so far as suits of a civil nature arising under the laws of the United States are concerned. (*Hargrave* v. *Mid-Continent Petroleum Corp.,* 36 F.Supp. 233; *Phillips* v. *Pucci,* 43 F.Supp. 253; and see W. S. Reese, Jr., *Concurrent Jurisdiction of State and Federal Courts under Section 16(b) of the Fair Labor Standards Act,* 27 Va.L.Rev. 328, 332-336.)

But, urges the respondent, no power exists in Congress to compel a state court to enforce a federally-created right of this nature. A consumer action under section 205(e) is in the nature of a penalty, the argument continues, and the penal laws of one sovereignty may not be enforced in another, according to *Wisconsin* v. *Pelican Insurance Co.,* 127 U.S. 265 [8 S.Ct. 1370, 32 L.Ed. 239], and *Huntington* v. *Attrill,* 146 U.S. 657 [13 S.Ct. 224, 36 L.Ed. 1123].

Apart from any effect which the relationships, under the United States Constitution, of state to state and state to federal government may have upon them, under well-estab-

lished principles relating to conflict of laws, no action may be maintained upon a right created by the law of a foreign state as a method of furthering its own governmental interests, nor can an action be maintained to recover a penalty, the right to which is given by the law of another state. (Rest., Conflict of Laws, §§610, 611; 3 Beale, Conflict of Laws (1935), sec. 1611.1, pp. 1639, 1640.) In addition, the forum will itself determine, in accordance with its own standards, whether a particular claim falls within these principles. (Rest., Conflict of Laws, §610, comment a.) Because of this fact, there is considerable disagreement in the decisions concerning what is a penalty. (See collection of cases in Goodrich on Conflict of Laws (2d ed. 1938) § 9, pp. 16-19; R. L. Leflar, *Extrastate Enforcement of Penal and Governmental Claims*, 46 Harv. L.Rev. 193.)

The test generally underlying most of the cases, however, is that a ''penalty'' includes any law compelling a defendant to pay a plaintiff other than what is necessary to compensate him for a legal damage done him by the former. (Goodrich on Conflict of Laws (2d ed. 1938) § 9, p. 17; R. A. Leflar, op. cit., pp. 203, 204.) And ordinarily, a short statute of limitations indicates that the amount of recovery authorized is a penalty. Under this definition, a New Hampshire statute providing for the recovery of three times the amount of interest paid above the legal rate in New Hampshire was held to be penal when action for that sum was brought in Vermont. (*Blaine* v. *Curtis*, 59 Vt. 120 [7A. 708, 59 Am. Rep. 702] ; *cf. Arnold* v. *Potter*, 22 Iowa 194.) Similarly, recovery was denied in New York upon a claim arising under a Pennsylvania statute awarding treble damages for rate discrimination. (*Langdon* v. *New York, L. E. & W. R. Co.*, 58 Hun 122 [11 N.Y.S. 514].) And a statute allowing double damages for injuries to live stock has been held penal and recovery denied in a state other than the one where the injury took place. (*Bettys* v. *Milwaukee & St. P. Ry. Co.*, 37 Wis. 323.) In line with this test, a New York statute making directors liable for all debts of the corporation upon failure to file a required report was held penal in character. (*Derrickson* v. *Smith*, 27 N.J.L. 166.) Again, a Massachusetts statute was construed as penal which provided for a ''fine'' of a minimum amount and increased the damages, not in proportion to the loss suffered by the plaintiff, but by the degree of culpability of the defendant. (*Adams, Admx.*, v.

*Fitchburg Railroad Co.*, 67 Vt. 76 [30 A. 687, 48 Am.St.Rep. 800]; and see cases collected in 62 A.L.R. 1330.)

The title of section 205 is "Enforcement." Subdivision (a) of the section authorizes the issuance of an order, upon the application of the Price Administrator, either enjoining a violation of or compelling compliance with the act; subdivision (b) defines the criminal consequences of a wilful violation, and subdivision (c) prescribes the jurisdictional and venue requirements for a criminal action. Subdivision (d) requires the court having jurisdiction of any suit in which a party relies "for ground of relief or defense upon this Act" or any regulation thereunder, to certify such fact to the administrator, who is given the right to intervene in the action. And, "in order . . . to assure compliance with and provide for the effective enforcement of any regulation," order, or price schedule, the Price Administrator is authorized, by subdivision (f), to require a license of those subject to such directives as a condition of selling a regulated commodity and, furthermore, to secure the revocation of the license for a violation of the regulation, order, or price schedule.

Subdivision (e), under which the petitioner's action was brought, provides: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. . . . If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States. Any suit or action under this subsection . . . shall be instituted within one year after delivery is completed or rent is paid."

A reasonable interpretation of section 205 (e) compels the conclusion that one of the primary purposes of providing for consumer actions was to aid in the enforcement of the act. Referring to subdivision (e), the Senate Committee said: "Such actions have proved valuable in the enforcement of other regulatory statutes, such as the Fair Labor Stand-

ards Act, both to relieve the Government of a part of the burden of enforcement and to deter initial violations." (S. Rep. No. 931, 77th Cong. 2d Sess., p. 9.)[8] Furthermore, the enforcement aspect of section 205(e) is emphasized by the authorization therein given to the Price Administrator to bring an action under it "on behalf of the United States" when the buyer is not entitled to maintain such a suit. Regarding this provision, the Senate Report declares: "The further provision that the Administrator may sue on behalf of the United States not only where the United States is the consumer but also if the buyer is not entitled to bring suit will apply to situations in which the buyer is barred for bad faith or for some other reason, or in which the buyer is a purchaser in the course of trade or business." (S. Rep. No. 931, 77th Cong., 2d Sess.) And the requirement that the recovery sought in the consumer action must be either $50 or treble the amount of the overcharge, whichever is greater, also indicates that Congress intended the minimum recovery of $50 to serve both as a deterrent to initial violations and as an inducement to the consumer to help enforce the act. For, as pointed out by the respondent, until the overcharge exceeds $16.67, it has no relation to the amount for which recovery is authorized.

The ratio of the overcharge to the minimum recovery of $50 thus varies substantially from case to case. It is true that in a well-considered case, the Court of Common Pleas of Erie County, Pennsylvania, construed this provision of section 205(e) as solely remedial in character. (*Pratt* v. *Hollenbeck* [March 1, 1943], page 622:76, Pike and Fischer OPA Service.) "Where small sums are involved," said the court, "the double and treble damage feature is merely one way of attempting to render full restitution to the injured party for the time, trouble and delays usually attendant in enforcing his rights. So considered, treble damages are remedial in fact as well as in law." Yet, in view of the congressional history and the provisions of section 205(e), it seems very certain that one of the primary purposes of Congress in cre-

---

[8]See also Ginsburg (then General Counsel, Office of Price Administration), *The Price Control Act; Authority and Sanctions*, 9 Law and Contemporary Problems, 22, 55, 56; according to this writer, "Statistical data regarding a similar provision in the Fair Labor Standards Act of 1938, 29 U.S.C.A., § 216, ilustrates its enforcement value. During the first three years of administration of that Act, approximately 85% of all enforcement proceedings, about 2815 in all, were such civil damage actions."

ating such a right was to further its governmental interest in the enforcement of the act.

But the general rules of conflict of laws governing the action of the forum are subject to modification or complete abrogation in a federated nation. Thus in the United States, the question of the power of a state to create interests which must be recognized in other states is to be determined in the light of the full faith and credit and the due process clauses of the United States Constitution. (See E. M. Dodd, *The Power of the Supreme Court to Review State Decisions in the Field of Conflict of Laws*, 39 Harv.L.Rev. 533; 3 Selected Essays on Constitutional Law (1938), pp. 1451, 1455-1463; W. W. Cook, *The Powers of Congress under the Full Faith and Credit Clause*, 28 YaleL.Jour. 421; 3 Selected Essays on Constitutional Law (1938), p. 1214; 11 Am.Jur., Conflict of Laws, sec. 7, pp. 304-306.) Article IV, section 1, of the federal Constitution provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." Pursuant to this power, Congress in 1790 provided the mode in which these "public Acts, Records and judicial Proceedings" were to be authenticated and prescribed their effect in language which has remained substantially unaltered. The present statute reads: "And the said records and judicial proceedings, so authenticated, shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from which they are taken." (U.S.Rev.St., §905; U.S.C.A., §687.)

Under the full faith and credit clause, it may well be that Congress could require the enforcement by one state of the penal laws of another. (For history of the clause, see W. W. Cook, op. cit., pp. 1216-1219.) And certainly it is within the province of the United States Supreme Court, in construing the clause, to define, as it did in the case of *Huntington* v. *Attrill*, 146 U.S. 657 [13 S.Ct. 224, 36 L.Ed. 1123], a penal law and to determine whether the statute under attack must be enforced by the forum.[9] It was there said that the

[9] That the Supreme Court, under existing law, is not yet willing to hold that a state must enforce the penal laws of a sister state is apparent from its decision in *Griffin* v. *McCoach*, 313 U.S. 498 [61 S.Ct. 1023, 85 L.Ed. 1481, 134 A.L.R. 1462].

test "whether a statute of one state, which in some aspects may be called penal, is a penal law in the international sense, so that it cannot be enforced in the courts of another state, depends upon the question whether its purpose is to punish an offense against the public justice of the state, or to afford a private remedy to a person injured by the wrongful act." (146 U.S. at page 673.) "The test," continued the court, "is not by what name the statute is called by the Legislature or the courts of the State in which it is passed, but whether it appears, to the tribunal which is called upon to enforce it to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person." (146 U.S. at page 683.) It should be noted, however, that the question before the court in *Huntington* v. *Attrill, supra,* concerned the recognition of a judgment obtained in a state other than the forum, and the case was not an original action to enforce a foreign-created right not yet reduced to judgment. (See in this regard Goodrich on Conflict of Laws (2d ed. 1938) §9, pp. 19, 20.)

But counsel, in relying upon *Huntington* v. *Attrill, supra,* as decisive of the question of the necessity for the respondent court to take jurisdiction of the consumer action, have fallen into a common error. For neither Congress nor the United States Supreme Court has the power, under the full faith and credit clause, to take from the state forum the right to decide, according to its own standards, whether a federal statute is a penal law unenforceable within its jurisdiction, since that clause of the Constitution applies only to acts of sister states. And the only express provisions of the federal Constitution which may be said to require a state to assume jurisdiction of a federally-created right are those which declare that the Constitution and the laws made in pursuance thereto "shall be the supreme law of the land" and that all executive and judicial officers shall be bound thereby. (U. S. Const., art. VI, secs. 2 and 3.)

If, in disregard of the principles of private international law, a state court must enforce a right of action created by federal statute where Congress has not restricted the enforcement of such an interest to the United States courts, such a conclusion must rest upon the character of the relationship existing between the national government and the states, and the superior position given that government when acting within the scope of its delegated powers. For obviously the state

courts are not exercising federal judicial power, as that power is vested exclusively in the Supreme Court of the United States "and in such inferior courts as the Congress may from time to time ordain and establish." (Art. III, sec. 1.) Furthermore, the state judges are not appointed by the President, with the advice and consent of the Senate (art. II, sec. 2, subd. 2), nor do they hold office for life. (Art. III, sec. 1; and see J. D. Barnett, *Delegation of Federal Jurisdiction*, 43 Am.L.Rev. (now United States L.Rev.) 852; 3 Selected Essays on Constitutional Law (1938), pp. 1202, 1208-1209.)

Certainly the complete separation of federal and state administration was not contemplated by the framers of the Constitution. (A. N. Holcombe, *The States as Agents of the Nation*, 3 Selected Essays on Constitutional Law (1938) pp. 1187, 1189; E. S. Corwin, Constitutional Revolution. Ltd. (1941), p. 97.) To illustrate the manner in which federal powers could be carried out by state officers under the proposed Constitution, James Madison in The Federalist cited the case of collection of revenue, observing that "the eventual collection (of taxes) under the immediate authority of the Union will generally be made by the officers, and according to the rules, appointed by the several states." Hamilton expressed a like opinion when he wrote in The Federalist that the officers of the states would be "rendered auxiliary" to the enforcement of the laws of the Union. ". . . and I am even of opinion," said Hamilton, "that in every case in which [the State courts] were not expressly excluded by the future acts of the national legislature, they will, of course, take cognizance of the causes to which those acts give birth . . . when . . . we consider the state governments and the national government, as they truly are, in the light of kindred systems, and as parts of ONE WHOLE, the inference seems to be conclusive, that the state courts would have concurrent jurisdiction in all cases arising under the laws of the union, where it was not expressly prohibited." (See *Claflin* v. *Houseman*, 93 U.S. 130, 138 [23 L.Ed. 833].) And, said the younger Pinckney on the floor of the Philadelphia Convention, "They [the States] are the instruments upon which the Union must frequently depend for the force and execution of its powers."

Early congressional legislation clearly reveals that those adopting the Constitution were of the opinion that the federal government would utilize the services of state officers in the execution of federal powers by virtue of the provisions of article VI relating to the supremacy of the Constitution and

laws of the Union and to the administration of oaths to the officers of the states, binding them to support the federal Constitution. For example, so far as the early internal revenue laws are concerned, the act of 1791 provides that "any action or suit to be brought against any person or persons, for anything done by him or them in pursuance of this act, shall [under certain conditions] . . . be laid" in the state courts, and that the penalty and forfeiture named in the act (one-half going to the informer, and the other half to the United States) "shall be recoverable . . . by action of debt, in the name of the person or persons entitled thereto, or by information, in the name of the United States." (Act of Mar. 3, 1791, ch. 15, secs. 42, 44, 1 Stat. 199.) This was followed by acts of a similar nature. (Acts of June 5, 1794, ch. 45, sec. 10, 1 Stat. 373; June 5, 1794, ch. 48, sec. 5, 1 Stat. 376; June 9, 1794, ch. 65, sec. 12, 1 Stat. 397; July 6, 1797, ch. 11, sec. 20, 1 Stat. 527, Feb. 28, 1799, ch. 17, sec. 5, 1 Stat. 622; July 24, 1813, ch. 25, sec. 6, 3 Stat. 42; Aug. 2, 1813, ch. 39, sec. 5, 3 Stat. 72.) The National Bank Act of 1864 provides that, with a certain exception, "suits, actions, and proceedings against any association under this act, may be held . . . in any State, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases." (Act of June 3, 1864, ch. 106, sec. 57, 13 Stat. 99, Rev. Stat., sec. 5198; Act of Feb. 18, 1875, ch. 80, 18 Stat. 316, 320.)

In addition, there can be no doubt, Congress intended that jurisdiction over federal crimes should be exercised by state courts. An act of 1806 authorized certain state courts "to take cognizance of all complaints and prosecutions for fines, penalties, and forfeitures, arising under the revenue laws" and "to exercise all and every power in the cases of a criminal nature, cognizable before them." (Act of Mar. 8, 1806, ch. 14, 2 Stats. 354; Act of Apr. 21, 1808, ch. 51, 2 Stats. 489.) Acts of 1815 and 1839 had a similar purpose. (Act of Mar. 3, 1815, ch. 101, 3 Stats. 244; Act of Feb. 28, 1839, ch. 36, sec. 3, 5 Stats. 321.) And in the post-office act of 1799, Congress directed "that all causes of action arising under this act may be sued, and all offenders against this act may be prosecuted, before the justices of peace, magistrates, and other judicial courts of the several states . . . having competent jurisdiction by the laws of such States . . . to the trial of claims and demands of as great value, and of prose-

cutions where the punishments are of as great extent; and such justices, magistrates, or judiciary, shall take cognizance thereof, and proceed to judgment and execution as in other cases." (Act of Mar. 2, 1799, ch. 43, sec. 28, 1 Stats. 733.) Moreover, implicit in the judiciary act of 1789 is the recognition of the power in state courts to exercise jurisdiction over crimes against the United States unless forbidden by Congress.[10]

The course of judicial decision on the issue of the utilization by Congress of the states as agencies for the execution of federal powers has been a wavering and uncertain one. Thus in *Prigg* v. *Pennsylvania*, 16 Pet. 539 [10 L.Ed. 1060], the court, speaking of the constitutional provision that any person held to service or labor in any state under the laws thereof who escaped into another state should be delivered up on the claim of the party to whom such service or labor might be due, said: "The clause is found in the national Constitution and not in that of any State. It does not point out any State functionaries or any State action to carry its provisions into effect. The States cannot, therefore, be compelled to enforce them; and it might well be deemed an unconstitutional exercise of the power of interpretation to insist that the States are bound to provide means to carry into effect the duties of the national government, nowhere delegated or intrusted to them by the Constitution." (16 Pet. 539, 615, 616 [10 L.Ed. 1060, 1089].) Considering specifically the provision of the fugitive slave law of 1793, however, conferring authority upon both federal and state judges to sanction the rendition of fugitives when duly claimed by their masters, as to the authority conferred upon state magistrates, Justice Story, speaking for the court, observed, "while a difference of opinion has existed, and may exist still on the point in different States whether State magistrates are bound to act under it, none is entertained by this court, that State magistrates may, if they choose, exercise that authority, unless prohibited by State legislation." In a separate concurring opinion, Mr. Justice McLean stated a different conclusion on this question. "It appears," he said, "in the case under consideration, that the State magistrate, before whom the fugitive was

---

[10] "The district courts shall have, exclusively of the courts of the several States, cognizance of all crimes and offenses that shall be cognizable under the authority of the United States . . . and shall have exclusive original cognizance . . . of all suits for penalties and forfeitures incurred, under the laws of the United States." Act of September 24, 1789, ch. 20, sec. 9, 1 Stat. 73.

brought, refused to act. In my judgment he was bound to perform the duty required of him by a law paramount to any act on the same subject in his own State." But because the majority of the court was not ready to assert even that Congress had the power to make state officers agents for the enforcement of the fugitive slave law, when enacting the more stringent fugitive slave law of 1850, the attempt to make the states agents of the nation was abandoned, and Congress confided the enforcement of the law entirely to federal officers. (See A. N. Holcombe, *op. cit.*, at p. 1192.)

The court over which Mr. Chief Justice Taney presided apparently was unwilling to come to any decision upholding the doctrine that the federal government could coerce a "sovereign" state. Thus in the case of *Kentucky* v. *Dennison,* 24 How. 66 [16 L.Ed. 717], the court held that article IV, section 2, requiring the delivery of a fugitive from justice upon the demand of the executive authority of the state from which he fled, imposed only a moral, as distinguished from a legal, obligation upon the states which they ought, but could not be compelled, to obey. This decision, together with *Prigg* v. *Pennsylvania, supra,* greatly impaired the usefulness of the states as agents of the federal government.

Other decisions of the United States Supreme Court have indicated a different trend. In *Claflin* v. *Houseman,* 93 U.S. 130 [23 L.Ed. 833], for example, the court had before it the question whether an assignee in bankruptcy could sue in the state courts. Claflin argued that the cause of action arose solely under federal law and could be prosecuted only in the federal courts. "When we consider the structure and true relations of the Federal and State governments," said the court, "there is really no just foundation for excluding the State Courts from all such jurisdiction."

"The laws of the United States," continued the court, "are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are. The United States is not a foreign sovereignty as regards the several States, but is a concurrent, and, within its jurisdiction, paramount sovereignty. Every citizen of a State is a subject of two distinct sovereignties, having concurrent jurisdiction in the State,—concurrent as to place and persons, though distinct as to subject-matter. Legal or equitable rights, acquired under either system of laws, may be enforced in any court of either sovereignty competent to hear and determine such kind of rights and not restrained by its constitution in

the exercise of such jurisdiction. . . . If an act of Congress gives a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some act of Congress, by a proper action in a State court. . . . The disposition to regard the laws of the United States as emanating from a foreign jurisdiction is founded on erroneous views of the nature and relations of the State and Federal governments. It is often the cause or the consequence of an unjustifiable jealousy of the United States government, which has been the occasion of disastrous evils to the country." (93 U.S. 130, 136, 137.)

In *Houston* v. *Moore*, 5 Wheat. 1 [5 L.Ed. 19], Houston, a delinquent under a federal law of 1795, providing for organizing and calling forth the militia and prescribing the punishment to be inflicted upon delinquents, to be determined by a court-martial, was tried by a state court-martial. The Supreme Court decided that the state court had jurisdiction of the offense, "irrespective of the authority, State or Federal, which created it. Not that Congress could confer jurisdiction upon the state courts, but that these courts might exercise jurisdiction on cases authorized by the laws of the State, and not prohibited by the exclusive jurisdiction of the Federal courts." (See discussion in *Claflin* v. *Houseman, supra,* p. 141.) And in *Teal* v. *Felton,* 12 How. 284 [13 L.Ed. 990], the Supreme Court sustained the bringing of an action in a state court against a postmaster for neglect of duty to deliver a newspaper under the postal laws of the United States.

The court, in *First National Bank* v. *Morgan,* 132 U.S. 141 [10 S.Ct. 37, 33 L.Ed. 282], recognized that "A suit [upon a right of action created by a federal statute] against a national bank to recover back twice the amount of interest illegally taken by it is a suit to recover a penalty incurred under a law of the United States." The statute in question provided that the action could be maintained in certain federal courts "or in any state, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases." In passing upon the effect of the provision, the court said that it "had the effect, so far as suits for penalties incurred under the laws of the United States were concerned, to modify the provision in prior enactments that expressly excluded suits for such penalties from the cognizance of state courts. When the present action was brought, the jurisdiction of the courts of the United States

of suits for penalties incurred under the national banking act for taking usurious interest, was not exclusive of, but concurrent with, the jurisdiction of such state, county, or municipal courts of the county or city in which the bank was located, as had jurisdiction, under the local law, in similar cases.'' (132 U.S. 141, 144.) And the state courts uniformly have assumed jurisdiction of such an action. (*Ingraham* v. *Merchants National Bank*, 153 Iowa 408 [132 N.W. 869]; *McCreary* v. *First National Bank*, 109 Tenn. 128 [70 S.W. 821]; *Endres* v. *First National Bank*, 66 Minn. 257 [68 N.W. 1092].)

At the close of the nineteenth century, an act of Congress was held not to be unconstitutional because it authorized justices of the peace to issue warrants to apprehend deserting seamen and deliver them up to the masters of their vessels. (*Robertson* v. *Baldwin*, 165 U.S. 275, 280 [17 S.Ct. 326, 41 L.Ed. 715].) The court, in interpreting article III, section 2, of the Constitution, concluded: ''We think the power of justices of the peace to arrest deserting seamen and deliver them on board their vessel is not within the definition of the 'judicial power' as defined in the Constitution, and may be lawfully conferred upon state officers. That the authority is a most convenient one to entrust to such officers cannot be denied, as seamen frequently leave their vessels in small places, where there are no federal judicial officers, and where a justice of the peace may usually be found, with authority to issue warrants under the state laws.'' The authority of this case is weakened by the recognition of the conflict of laws rule against enforcement of penal laws and its citation of *Huntington* v. *Attrill, supra,* to that effect, as well as by its strained construction of what is included in federal judicial power, but the decision is of importance in disclosing an awareness of the necessity for state administration of federal law.

*Holmgren* v. *United States*, 217 U.S. 509 [30 S.Ct. 588, 54 L.Ed. 861], involved the question whether a conviction can be had in a federal court for swearing falsely in naturalization proceedings had in a state court. Congress is invested with the power to establish a uniform rule of naturalization by article I, section 8, clause 4, of the Constitution. It passed a law authorizing naturalization proceedings in certain state courts. The court held that, although Congress may not create courts for the states, it may authorize a state court to enforce, in a prescribed manner, a federal statute relating to a matter within federal control. The court did add, however (at p.

517), that ''The question is not here presented whether the States can be required to enforce such naturalization laws against their consent, for it appears that the Constitution of the State of California, in section 5, article 6, and the statute in section 76 of the Code of Civil Procedure of that State, grant to the courts the power of naturalization and the right to issue papers therefor.''

It is true that *Claflin* v. *Houseman, supra,* was disapproved insofar as its discussion of state enforcement of federal penalties was concerned, in *Huntington* v. *Attrill, supra,* where the court, by way of dictum, declared, ''the courts of a State cannot be compelled to take jurisdiction of a suit to recover a . . . penalty for a violation of a law of the United States.'' (146 U.S. 657, 672.) But, at a later time, in the Second Employers' Liability Cases, 223 U.S. 1 [32 S.Ct. 169, 56 L.Ed. 327], the court reaffirmed that portion of *Claflin* v. *Houseman, supra,* which has been quoted, although it inserted after the word ''penalty'' the interpretation ''meaning civil and remedial.'' As in the present proceeding, the Second Employers' Liability Cases also involved the application of a uniformly recognized principle of private international law, the one there considered being the rule that no action can be maintained upon a cause of action created in another state, the enforcement of which is contrary to the public policy of the forum. (See Rest., Conflict of Laws, sec. 612; 11 Am.Jur.; Conflict of Laws, sec. 11, pp. 310, 311.) In one of those cases the Supreme Court of Errors of Connecticut had held that the superior courts of that state had no jurisdiction to entertain a suit for personal injuries under the federal Employers' Liability Act because that statute abrogated certain common-law defenses, such as the fellow-servant rule, which were then allowed in Connecticut. Answering this argument, the Supreme Court, through Mr. Justice Van Devanter, said: ''The suggestion that the act of Congress is not in harmony with the policy of the State, and therefore that the courts of the State are free to decline jurisdiction, is quite inadmissible, because it presupposes what in legal contemplation does not exist. When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for all the people and all the States, and thereby established a policy for all. That policy is as much the policy of Connecticut as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the State.'' (P. 57.) Accord-

ingly, the court concluded, "rights arising under the act in question may be enforced, as of right, in the courts of the States when their jurisdiction, as prescribed by local laws, is adequate to the occasion." And the same conclusion was reached in *McKnett* v. *St. Louis & S. F. Ry. Co.*, 292 U.S. 230, 233 [54 S.Ct. 690, 78 L.Ed. 1227], where the court said: "The power of a State to determine the limits of the jurisdiction of its courts and the character of the controversies which shall be heard in them is, of course, subject to the restrictions imposed by the Federal Constitution."

From the course of the decisions, it is apparent that the federal Supreme Court has moved slowly and with obvious reluctance, in the area of conflicting jurisdiction between the States and the Nation, to compel unwilling states to enforce federal laws. A state court, however, should willingly and unequivocally recognize a clear constitutional duty.

Considering the respective fields of authority in our federal system of government, there are two conflicting concepts of the relationship between the nation and the states—the principle of competition and that of cooperation. It has been said, on good authority, that with certain notable exceptions (*Ex parte Siebold*, 100 U.S. 371 [25 L.Ed 717]; *Hoke* v. *United States*, 227 U.S. 308, 322 [33 S.Ct. 281, 57 L.Ed. 523]) the competitive conception of the federal relationship was dominant in the century following the death of Mr. Chief Justice Marshall. (E. S. Corwin, Constitutional Revolution, Ltd. (1941), pp. 97, 98.) But, particularly within the last decade, the courts have increasingly recognized the cooperative nature of our federal system and that there are, in fact, no reserved state powers which may be asserted in hostility to the authorized exercise of federal power. (*United States* v. *Darby*, 312 U.S. 100, 123, 124 [61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430]; and see W. F. Dodd, *The Decreasing Importance of State Lines*, 27 Am.BarAssn.Jour. 78.)

A selfish and jealous assertion by state courts of nonexistent "sovereign" rights is untenable in the present case. The Restatement of Conflict of Laws, although announcing the common-law rules regarding the enforcement of foreign penalties and recognizing the right of the forum to refuse enforcement of foreign rights incompatible with the public policy of the forum, observes: "The desirability of uniform

enforcement of rights acquired in other states is especially strong among the States of the United States. Differences in policy among them are of minor nature, and for the most part relate to internal affairs. The social interest in uniform enforcement regardless of State lines is particularly great." (Sec. 612, comment c. For an exceptionally thorough criticism of the rule against enforcing penal and governmental claims of sister states, see R. A. Leflar, *Extrastate Enforcement of Penal and Governmental Claims,* 46 Harv.L.Rev. 193.) *A fortiori,* how much more imperative it is for the states to recognize and enforce rights created by federal law. Unlike the relationships of completely sovereign states giving rise to the adoption of rules of private international law, the Restatement recognizes that "In the legal sense, the United States is not a state because each State, Territory and District and each small portion of federal territory has its own law. The legislation of Congress is a portion of the law of each State, identical in each." (Rest., Conflict of Laws, sec. 2, comment c.) This is but a different manner of stating the views expressed in *Claflin* v. *Houseman, supra,* and in the Second Employers' Liability Cases, *supra.* ▮▮▮ As Congress, in the lawful exercise of a constitutional power, by its statutes declares the policy for both the people and the states (see Second Employers' Liability Cases, *supra,* p. 57), so does it declare the policy of the people and of the states with regard to the enforcement of a law such as the Emergency Price Control Act of 1942. In enforcing that act by assuming jurisdiction of a consumer action pursuant to congressional mandate, in the course of the exercise of its ordinary jurisdiction, a state court is not entertaining an action created by a totally unrelated sovereign, but is merely yielding to the superior exercise of a lawful right granted Congress by the United States Constitution.

▮▮▮ It is true that state courts generally have refused to assume jurisdiction to enforce acts of Congress which they have considered as "penal in an international sense." (See cases collected in J. D. Barnett, *op. cit.,* at pp. 1206-1208; and see those cited in Huntington v. Attrill, supra, at p. 672; but see *Charlotte First National Bank* v. *Morgan,* 132 U.S. 141 [10 S.Ct. 37, 33 L.Ed. 282]; *Ingraham* v. *Merchants Nat. Bank,* 153 Iowa 408 [132 N.W. 869]; *McCreary* v. *First Nat. Bank,* 109 Tenn. 128 [70 S.W. 821]; *Endres* v. *First Na-*

*tional Bank,* 66 Minn. 257 [68 N.W. 1092] ; and W. S. Reese, Jr., *Concurrent Jurisdiction of State and Federal Courts under section 16(b) of the Fair Labor Standards Act,* 27 Va.L.Rev. 328, 343.) But, considering the intent of the framers of the Constitution, the acts of the early Congresses, and the provisions of article VI establishing the supremacy of federal law, it seems clear that a state court, otherwise competent to exercise jurisdiction over the subject-matter, the parties, and the amount in controversy, must assume jurisdiction of an action created by federal law enacted pursuant to a legitimate federal function, regardless of whether or not that action be considered either as penal or as furthering the governmental interest.

Any argument of hardship which, it may be asserted, will result from the additional burden of litigation in state courts, must be considered settled by the Supreme Court of the United States. ''We are not disposed,'' the court observed, ''to believe that the exercise of jurisdiction by the state courts will be attended by any appreciable inconvenience or confusion; but, be this as it may, it affords no reason for declining jurisdiction conferred by law. The existence of the jurisdiction creates an implication of duty to exercise it, and that its exercise may be onerous does not militate against that implication.'' (Second Employers' Liability Cases, 223 U.S. 1, 58 [32 S.Ct. 169, 56 L.Ed. 327].)

### Is the Small Claims Court a Court of Competent Jurisdiction?

The remaining question is whether the small claims court is authorized by the laws of this state to try actions in the nature of the consumer action provided for by section 205(e) of the act.

The only express limitations upon the jurisdiction of the small claims court, as to subject matter, are that the action be for the recovery of money only and that the amount claimed must not exceed $50, exclusive of costs. (Code Civ. Proc., sec. 117.) The phrase ''cases for the recovery of money only,'' appearing in section 117, *supra,* is not limited to ordinary contract claims but includes a claim not exceeding fifty dollars for damages due to negligence. (*Leuschen* v. *Small Claims Court,* 191 Cal. 133 [215 P. 391].) Since the relief sought by the petitioner in his action against O'Farrell

is solely monetary, and as his claim does not exceed $50, the small claims court obviously has jurisdiction of the subject matter. And the action meets the other statutory requirements, for O'Farrell resides within the jurisdiction of the respondent court, and the petitioner filed and sought to prosecute his action in propria persona. (Code Civ. Proc., secs. 117, 117g.)

The fact that section 205(e) of the federal act in terms provides for a minimum recovery of $50, "plus reasonable attorney's fees and costs as determined by the court" does not place the amount of the petitioner's suit beyond the maximum jurisdictional limit of the small claims court. Section 117q of the Code of Civil Procedure entitles the prevailing party to costs of the action, and as the plaintiff in a small claims suit is prohibited from employing an attorney, there obviously are no attorney's fees to be "determined by the court."

For the reasons stated the respondent court was in error when it refused to entertain the proceeding brought by Miller, and mandamus is the proper remedy to compel that action. (*Katenkamp* v. *Superior Court,* 16 Cal.2d 696, 698 [108 P.2d 1]; *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547]; *City of San Diego* v. *Andrews,* 195 Cal. 111 [231 P. 726]; *Hennessy* v. *Superior Court,* 194 Cal. 368 [228 P. 862]; *Burdge* v. *Superior Court,* 41 Cal.App.2d 547 [107 P.2d 290].)

Let the peremptory writ issue.

Gibson, C. J., Curtis, J., Traynor, J., and Schauer, J., concurred.

CARTER, J.—I concur in the conclusion reached in the opinion prepared by Mr. Justice Edmonds that a peremptory writ of mandate should issue in this case directing the municipal court sitting as a small claims court in the city of Los Angeles to proceed with the trial of the case of *Miller* v. *O'Farrell,* but, as I am not in accord with all of the views expressed in said opinion, I am disposed to present my views in a separate opinion.

As I see the problem presented for consideration, it is first, whether the Emergency Price Control Act of 1942 (56 Stats., 23, 50 U.S.C.A.App. secs. 901-946) is constitutional, and if so, is the small claims court required to assume jurisdiction of causes arising under section 205(e) of said act.

The Emergency Price Control Act was passed on January 30, 1942, with the express statement by Congress that it was "necessary to the effective prosecution of the war" (sec. 1), and the United States Supreme Court in commenting on the act has characterized it as "a statute borne of the exigencies of war." (*Scripps-Howard Radio Inc.* v. *Federal Communications Commission*, 316 U.S. 4, 17 [62 S.Ct. 875, 86 L.Ed. 1229].) Referring to the provisions of the Constitution of the United States which specify the various powers of Congress, we find that the constitutional basis of the act is in the power of Congress to make all laws necessary and proper for carrying into effect its war powers.

Article I, section 8, of the Constitution specifically grants to Congress broad and plenary powers to enact legislation in the interest and furtherance of the national defense and in the carrying on of a war. It provides in part: "The Congress shall have the power to lay and collect taxes . . . to pay the debts and provide for the common defense and general welfare of the United States. . . . To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water; to raise and support armies, but no appropriation of money to that use shall be for a longer term than 2 years; to provide and maintain a Navy; to make rules for the government and regulations of the land and naval forces; to provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions; . . . to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or office thereof. . . ."

In speaking of "The Fighting Powers of the United States Under the Constitution," Hon. Charles Evans Hughes said: "The power to wage war is the power to wage war successfully. The framers of the Constitution were under no illusions as to war. They had emerged from a long struggle which had taught them the weakness of a mere confederation, and they had no hope that they could hold what they had won save as they established a Union which could fight with the strength of one people under one government entrusted with the common defense. In equipping the National Government with the needed authority in war they tolerated no limitations inconsistent with that object, as they realized that the very existence of the Nation might be at stake and that

every resource of the people must be at command.'' (Cong. Rec. Volume 55, Pt. 8, 65th Cong. 1st Sess. Appendix.)

It would appear from the language of the Supreme Court of the United States in the case of *United States* v. *MacIntosh*, 283 U.S. 605 [51 S.Ct. 570, 75 L.Ed. 1302], that no boundary has been fixed beyond which the government may not go in its exercise of the war powers if the interests of the nation demand. The court there stated:

''From its very nature, the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams,— ''This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property, and of life.'' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; *prices of food and other necessities of life fixed or regulated;* railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war.''

And, as was likewise said by the Supreme Court of the United States in the case of *Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398 [54 S.Ct. 231, 78 L.Ed 413, 88 A.L.R. 1481], ''keeping in mind at all times: . . . the war power of the federal government is not created by the emergency of war, but is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme cooperative effort to preserve the nation.''

The United States Supreme Court has upheld the power of the Federal Government in the interest of national defense, to take over and operate railroads, (*Northern Pacific Railroad Co.* v. *North Dakota,* 250 U.S. 135 [39 S.Ct. 502, 63 L.Ed. 897]); to take over and operate telegraph and tele-

phone systems, (*Dakota Central Telephone Co.* v. *South Dakota*, 250 U.S. 163 [39 S.Ct. 507, 63 L.Ed. 910]); to place compulsory orders for materials required for national defense, (*Moore & Tierney, Inc.* v. *Roxford Knitting Co.*, 265 F. 177 [11 A.L.R. 1415], cert. den. 253 U.S. 498 [40 S.Ct. 588, 64 L.Ed. 1032]); to draft man power for service in the armed forces, (Selective Draft Law Cases, 245 U.S. 366 [38 S.Ct. 159, 62 L.Ed. 349]); to prohibit the manufacture or sale of alcoholic beverages, (*Hamilton* v. *Kentucky Distilleries & W. Co.*, 251 U.S. 146 [40 S.Ct. 106, 64 L.Ed. 194], *Jacob Ruppert* v. *Caffey*, 251 U.S. 264 [40 S.Ct. 141, 64 L.Ed. 260]); to regulate the prices of certain commodities, (*Highland* v. *Russell Car & Snow Plow Co.*, 279 U.S. 253 [49 S.Ct. 314, 73 L.Ed. 688]); to control rents (*Block* v. *Hirsh*, 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865]); and to maintain the civilian morale by the lessening of "apprehension on the part of consumers in respect of their supply and the prices liable to be exacted," (*Highland* v. *Russell Car & Snow Plow Co.*, 279 U.S. 253, 261 [49 S.Ct. 314, 73 L.Ed. 688]).

The policy of Congress in the enactment of the Emergency Price Control Act and the purposes and objects to be accomplished thereby, that is, the need for price control in the interest of national defense and in the effective prosecution of the war, is disclosed by the following declaration contained in section 1(a) of the act itself: "It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this act are, to stabilize prices and to prevent speculative, unwarranted and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the federal, state, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices

in the manner provided in Section 3; and to permit voluntary cooperation between the government and producers, processors, and others to accomplish the aforesaid purposes.''

To effectuate these purposes, maximum prices and rent regulations are to be promulgated. The procedure for issuance of Price Regulations is described in section 2(a) providing in part: ''Whenever in the judgment of the Price Administrator . . . the price or prices of a commodity or commodities have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this act, he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this act. So far as practicable, in establishing any maximum price, the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941 (or if, in the case of any commodity, there are no prevailing prices between such dates, or the prevailing prices between such dates are not generally representative because of abnormal or seasonal market conditions or other cause, then to the prices prevailing during the nearest two-week period in which, in the judgment of the Administrator, the prices for such commodity are generally representative), for the commodity or commodities included under such regulation or order, and shall make adjustments for such relevant factors as he may determine and deem to be of general applicability, including the following: Speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941. Every regulation or order issued under the foregoing provisions of this subsection shall be accompanied by a statement of the considerations involved in the issuance of such regulation or order. . . . Before issuing any regulation or order under the foregoing provisions of this subsection, the Administrator shall, so far as practicable, advise and consult with representative members of the industry which will be affected by such regulation or order. . . .''

It is obvious from the foregoing that the objective sought to be accomplished by the Emergency Price Control Act was that commodity prices be fixed on a fair and equitable basis during the period of economic chaos due to the abnormal conditions created by the existence of the war. It is likewise

obvious that to effectuate the purposes of this act the price administrator must give due consideration to prices prevailing during certain specific periods of normalcy and make adjustments for such relevant factors as the administrator determines to be of general applicability, including certain specific factors enumerated in the act.

In commenting upon the powers conferred upon the administrator by the provisions of this act the United States District Court for Kansas in the case of *Henderson* v. *Kimmel*, 47 F.Supp. 635, said:

"Here, the Act contains both a clear statement of a definite policy of Congress and adequate, intelligible standards to guide the Administrator in fixing maximum rental. The objectives of the Act are set forth in Section 1(a) in meticulous detail. . . . Congress must state, insofar as is reasonably practicable, the purpose which it seeks to accomplish and the standards by which that purpose is to be worked out. It may then constitutionally delegate to an administrative agency the powers to determine the details essential to carry out the legislative purpose."

It is obvious that the intricacies and diversity of the economic problems raised in price administration are such that Congress would be attempting the impossible if it sought to enact specific price ceilings for various commodities, and an undue rigidity imparted to the act would foster injustice and might well lead to a breakdown in administration. The market behavior of a multitude of commodities presents such a variety of patterns that it would be rash to establish standards narrowly confining the discretion of the administrator and yet to expect the results that are imperative. The act provides that the administrator, after having considered so far as practicable the prices prevailing during a past period must make adjustments for such relevant factors as he holds to be of general applicability, including certain specific factors specified in the act.

While our attention has not been called to any decisions of courts of last resort passing upon the validity of the federal Emergency Price Control Act of 1942, its constitutionality has been upheld in the following cases by United States District Courts where its validity was challenged. *Henderson* v. *Kimmel*, 47 F.Supp. 635 (D.C.D.Kan. 1942); *United States* v. *C. Thomas Stores, Inc.*, 49 F.Supp. 111 (U.S.Dist.Ct., D. Minn. Feb. 26, 1943); *United States* v. *Slobodkin*, 48 F.

Supp. 913 (U.S.Dist.Ct., D.Mass., March 2, 1943); *United States* v. *Hark and Yaffee*, 49 F.Supp. 95 (U.S.Dist.Ct., D. Mass., March 5, 1943); *United States* v. *Charney*, 50 F.Supp. 581.

Respondents rely strongly upon the cases of *Panama Refining Co.* v. *Ryan*, 293 U.S. 388 [55 S.Ct. 241, 79 L.Ed. 446], and *Schechter Poultry Corp.* v. *United States*, 295 U.S. 495 [55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947], both involving the National Industrial Recovery Act in support of their contention that the federal Emergency Price Control Act is an unconstitutional delegation of legislative power, but in my opinion these cases are clearly distinguishable, as they involved the construction of an act basicly different both as to subject matter and objectives from the Emergency Price Control Act. Furthermore, it is clear that during a period of war emergency, the scope of discretion which Congress may constitutionally accord to the executive branch of the government is necessarily broader than that which may be accorded in normal times.

The standards of the Emergency Price Control Act are as definite and as detailed as they can be without defeating the objectives of this legislation, when due regard is given to the needs of legislative and administrative practicability.

As was said in *Opp Cotton Mills* v. *Administrator*, 312 U.S. 126, 145 [61 S.Ct. 524, 85 L.Ed. 624], (1941), in upholding the delegation of power to set minimum wages under the Fair Labor Standards Act: "The Constitution, viewed as a continuously operative charter of government, is not to be interpreted as demanding the impossible or the impracticable. The essentials of the legislative function are the determination of the legislative policy and its formulation as a rule of conduct. Those essentials are preserved when Congress specifies the basic conclusions of fact upon ascertainment of which, from relevant data by a designated administrative agency, it ordains that its statutory command is to be effective."

That Congress need only establish standards within the realm of reasonable practicability was also stressed in *United States* v. *Rock Royal Co-op*, 307 U.S. 533, 574 [59 S.Ct. 993, 83 L.Ed. 1446] (1939): "From the earliest days the Congress has been compelled to leave to the administrative officers of the government authority to determine facts which were to put legislation into effect and the details of regulations which would implement the more general enactments. It is well

settled, therefore, that it is no argument against the constitutionality of an act to say that it delegates broad powers to executives to determine the details of any legislative scheme. This necessary authority has never been denied. In dealing with legislation involving questions of economic adjustment, each enactment must be considered to determine whether it states the purpose which the Congress seeks to accomplish and the standards by which that purpose is to be worked out with sufficient exactness to enable those affected to understand these limits. Within these tests the Congress needs specify only so far as is reasonably practicable."

Likewise, in *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U.S. 381, 398 [60 S.Ct. 907, 84 L.Ed. 1263] (1940), the court declared: "The standards which Congress has provided here far exceed in specificity others which have been sustained. Certainly in the hands of experts the criteria which Congress has supplied are wholly adequate for carrying out the general policy and purpose of the Act. To require more would be to insist on a degree of exactitude which not only lacks legal necessity but which does not comport with the requirements of the administrative process. Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility. *Currin* v. *Wallace,* 306 U.S. 1, 15 [59 S.Ct. 379, 83 L.Ed. 441] and cases cited. But the effectiveness of both the legislative and administrative processes would become endangered if Congress were under the constitutional compulsion of filling in the details beyond the liberal prescription here. Then the burdens of minutiae would be apt to clog the administration of the law and deprive the agency of that flexibility and dispatch which are its salient virtues."

From my study and analysis of the Emergency Price Control Act of 1942, and the authorities defining the extent of the war powers of Congress, I am convinced that said act is not in violation of any of the provisions of the Constitution of the United States and is a valid exercise of the war powers conferred upon Congress by said Constitution.

Turning to the question of whether or not the small claims court is required to assume jurisdiction of actions brought pursuant to section 205(e) of the Emergency Price Control Act, I think it is clear that such court has jurisdiction of the action which is the subject of this proceeding and should be required to exercise such jurisdiction.

It is conceded by all parties to this proceeding "that lawful rights of the citizen, whether arising from a legitimate exercise of state or national power, unless excepted by express constitutional limitation or by valid legislation to that effect, are concurrently subject to be enforced in the courts of the state or nation when such rights come within the general scope of the jurisdiction conferred upon such courts by the authority, state or nation creating them." *Carse* v. *Marsh,* (1922), 189 Cal. 743 [210 P. 257]; *United States* v. *Stevens,* (1925), 103 Conn. 7 [130 A. 249]; *United States* v. *Sumner,* (1925), 125 Misc. 658 [211 N.Y.S. 705]; *United States* v. *Richards,* (1930), 201 Wis. 130 [229 N.W. 657]; *Ex parte Gounis,* (1924), 304 Mo. 428, 443 [263 S.W. 988]; *Mondou* v. *New York, N. H. & H. R. Co.,* (1912), 223 U.S. 1 [32 S.Ct. 169, 56 L.Ed. 327]; *Minneapolis & St. Louis R. R. Co.* v. *Bombolis,* (1916), 241 U.S. 211 [36 S.Ct. 595, 60 L.Ed. 961]; *Holmberg* v. *Lake Shore & M. S. Ry. Co.,* (1915), 188 Mich. 605 [155 N.W. 504]; *State ex rel. Schendel* v. *District Court of Lyon County,* (1923), 156 Minn. 380, 381 [194 N.W. 780].

It has also been held that an employee's suit for double the amount of unpaid wages authorized by the Federal Fair Labor Standards Act may be instituted in state courts pursuant to the provision that such actions may be commenced "in any court of competent jurisdiction." *Forsyth* v. *Central Foundry Co.,* 240 Ala. 277 [198 So. 706] (1940); *Duke* v. *Helena-Glendale Ferry Co.,* 203 Ark. 865 [159 S.W.2d 74, 139 A.L.R. 1404] (1942); *Adair* v. *Traco Division,* 192 Ga. 59 [14 S.E.2d 466] (1941); *Harrison* v. *Herzig Building & Supply Co.,* 290 Ky. 445 [161 S.W.2d 908] (1942); *Mengel* v. *Ishee,* 192 Miss. 366 [4 So.2d 878] (1941); *Abre* v. *Lindsay Bros. Co.,* 211 Minn. 136 [300 N.W. 457] (1941); *Emerson* v. *Mary Lincoln Candies, Inc.,* 173 Misc. 531 [17 N.Y.S.2d 851] (1941), aff'd *per curiam,* 287 N.Y. 577 [38 N.E.2d 234], 26 N.Y.S.2d 489 (1941); *Atkocus* v. *Terker,* 30 N.Y.S. 2d 628 (1941); *Hart* v. *Gregory,* 218 N.C. 184 [10 S.E.2d 644, 130 A.L.R. 265] (1940); *Floyd* v. *DuBois Soap Co.,* (Ohio App.) 38 N.E.2d 919 (1941); *Tapp* v. *Price-Brass Co.,* 177 Tenn. 189 [147 S.W.2d 107] (1941); *Stringer* v. *Griffin Grocery Co.,* (Tex.Civ.App.) 149 S.W.2d 158 (1941); *Hargrave* v. *Mid-Continent Petroleum Corp.,* 36 F.Supp. 233 (E.D.Okla. 1941); aff'd 129 F.2d 655 (C.C.A. 10, 1942).

Section 205(e) of the Emergency Price Control Act provides that: "Any suit or action under this subsection may be brought in any court of competent jurisdiction." Section

205(c), which contains the general jurisdictional provisions of the act, provides in part: "The district courts shall have jurisdiction of criminal proceedings for violations of Section 4 of this Act and *concurrently with State and Territorial courts, of all other proceedings under Section 205 of this Act.*"

It is the contention of respondents that the recovery authorized by the Federal Emergency Price Control Act of 1942, by a consumer who has been overcharged for a commodity in violation of the provisions of said act is a penalty created by federal law which cannot be enforced in the California courts. They rely mainly upon the cases of *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265 [8 S.Ct. 1370, 32 L.Ed. 239], and *Huntington* v. *Attrill*, 146 U.S. 657 [13 S.Ct. 224, 36 L.Ed. 1123]. In my opinion the authorities do not support the position taken by respondents and that the recovery authorized by the Emergency Price Control Act to a consumer is not a penalty in the sense that that term has been defined by the leading authorities throughout the United States. The basic test to be applied to determine whether a statutory action is an action for a penalty, was that stated by the Supreme Court of the United States in the leading case of *Huntington* v. *Attrill, supra,* where the court said at page 667: "Penal laws, strictly and properly, are those imposing punishment for an offense committed against the state and which, by the English and American Constitutions the executive of the state has the power to pardon. Statutes giving a private action against the wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal."

And at pages 673-674: "The question whether a statute of one state, which in some aspects may be called penal, is a penal law in the international sense, so that it cannot be enforced in the courts of another 'state, depends upon the question whether its purpose is to punish an offense against the public justice of the state or to afford a private remedy to a person injured by the wrongful act.' "

The United States Senate Committee which dealt with the Emergency Price Control Act referred to the type of action which is the subject of this proceeding as "actions to recover damages." In connection with this phase of the act, the committee stated: "Actions to recover damages—Such actions have proved valuable in the enforcement of other regulatory statutes, such as the Fair Labor Standards Act, both to re-

lieve the Government of a part of the burden of enforcement and to deter initial violations. They afford a remedy at law to persons damaged by having to pay unlawfully high prices." (S. Rep. No. 931, 77th Cong., 2nd Sess. P. 9.)

Corpus Juris Secundum classifies actions as remedial and penal. In volume 1, page 1180, section 69 of this work, it states:

"Actions—Remedial and Penal: A remedial action is to be distinguished from a penal action in that the former is given to, and is brought by, the party aggrieved, and the recovery allowed is in the nature of compensation or indemnity for the injury done or loss sustained, an action of this character being remedial notwithstanding the amount recoverable may exceed the damages proved, while the latter is given to, and may be brought by, anyone who will sue, such as a common informer, or a designated plaintiff who need not show that he has sustained any injury, and the recovery allowed is not to compensate plaintiff, but to punish defendant."

This subject was recently before the trial courts of New Jersey and Pennsylvania where it was exhaustively reviewed in opinions written by able jurists. The case of *Walters* v. *Melavas* was decided by the District Court of Orange, New Jersey in 1943, and is reported at page 622:91 Pike and Fischer OPA Service, and the case of *Pratt* v. *Hollenbeck* was decided by the Court of Common Pleas, Erie County, Penna., on March 1, 1943, and is reported at page 622:76 Pike and Fischer OPA Service. Both of these cases after an exhaustive review of the authorities hold that the provision in section 205(e) of the Emergency Price Control Act authorizing the recovery of the sum of $50 in lieu of treble damages for an overcharge is remedial rather than penal. Such holding is in accord with the great weight of authority throughout the United States and is supported by the following well considered cases: *Whitman* v. *Oxford National Bank*, (1900), 176 U.S. 559 [20 S.Ct. 477, 44 L.Ed. 587]; *Kirtley* v. *Holmes*, (1901), 107 F. 1 [46 C.C.A. 102, 52 L.R.A. 738]; *Chattanooga Foundry & P. Wks.* v. *City of Atlanta*, (1906), 203 U.S. 390 [27 S.Ct. 65, 51 L.Ed. 241]; *Cox* v. *Lykes Bros.*, (1927), 237 N.Y. 376 [143 N.E. 226]; *Younts* v. *Southwestern Tel. & Tel. Co.*, (1911), 192 F. 200; *Gruetter* v. *Cumberland Tel. & Tel. Co.*, (1909), 181 F. 248; *Boston & Maine R. R.* v. *Hurd*, (1901), 108 F. 116 [47 C.C.A. 615, 56 L.R.A. 193]; *Brady* v. *Daly*, (1899), 175 U.S. 148 [20 S.Ct. 62, 44 L.Ed.

109]; *Atchison T. & S. F. Ry. Co.* v. *Nichols,* (1924), 264 U.S. 348 [44 S.Ct. 353, 68 L.Ed. 720]; *Overnight Motor Transportation Co.* v. *Missel,* (1942), 316 U.S. 572 [62 S.Ct. 1216, 86 L.Ed. 1682].

A review of the foregoing authorities convinces me beyond doubt that the recovery provided for in the Emergency Price Control Act by a consumer who has been overcharged is remedial and not penal and may be enforced in the courts of California having jurisdiction of the amount of the recovery authorized.

It must be conceded by everyone that during the present national emergency, citizens are entitled to freedom from undue economic pressure. Certainly a remedy given by Congress to a consumer injured by virtue of the violation of price ceilings fixed by the price administrator does not constitute a penalty. It is simply a civil liability fixed by statute in lieu of damages for the violation of a civil right established by a federal statute.

That section 205 (e) is civil and remedial in nature rather than penal is further emphasized when it is remembered that section 205 (b) of said act provides for criminal prosecution of willful violators. Obviously, a person who had suffered a judgment as the result of a consumer's treble damage action could not plead such judgment as a bar to a criminal prosecution upon the theory that the consumer's treble damage action was "penal" in nature and that, therefore, any criminal prosecution would involve double jeopardy. *United States ex rel. Marcus* v. *Hess,* 317 U.S. 537 [63 S.Ct. 379, 87 L.Ed. 443]. (January 18, 1943.)

In my opinion the peremptory writ of mandate prayed for should issue.